# Commonwealth v. Tompkins, Appellant.

*Criminal law—Murder—Insanity—Evidence—Charge.*

On the trial of an indictment for murder, where the defense is insanity, it is reversible error for the trial judge to hold up to judicial ridicule the plea made for the prisoner, by stating to the jury that the prisoner was "of a class vulgarly called cranks" and

that "those beings, who live with these unsettled minds, who are not taken care of by friends, relatives, or the State, when caught in the act of crime, must be punished."

Argued April 14, 1919. Appeal, No. 44, Oct. T., 1919, by defendant, from judgment of O. & T. Cambria Co., Sept. T., 1917, No. 7, on verdict of guilty of murder of the first degree in case of Commonwealth v. George Tompkins. Before BROWN, C. J., MOSCHZISKER, FRAZER, SIMPSON and KEPHART, JJ. Reversed.

Indictment for murder. Before O'CONNOR, J.

Verdict of guilty of murder of the first degree upon which judgment of sentence was passed. Defendant appealed.

*Error assigned* was (2) the portion of the charge of the court quoted in the opinion of the Supreme Court.

*John E. Evans* and *John H. McCann,* for appellant.

No brief for appellee.

OPINION BY MR. CHIEF JUSTICE BROWN, May 21, 1919:

The appellant was defended on his trial on the ground of insanity, but the plea was unavailing, and he was found guilty of murder of the first degree. If he knew what he did at the time he committed the homicide, his offense was rank; but however atrocious it may have been, the duty rested upon the trial judge to instruct the jury dispassionately as to the settled law relating to the plea of insanity. This he did briefly in one portion of his charge, but in other parts of it he held up at length to judicial ridicule the plea made for the prisoner. As a part of his instruction to the jury he read to them the following extracts from an opinion of a lower court refusing a new trial to one alleged to have been insane at the time he committed the offense of which the jury found him guilty: "He is one of a class vulgarly called

cranks, who are not bad enough for an insane asylum, and infest society with their dangerous tendencies until they commit some crime, and then sympathy is sought for them by the aid of medical experts to show that they were insane on some particular subject, and thus not morally accountable. The law, differing from the medical theories, was never intended to protect such people. It is said: What difference does it make if they are acquitted on the ground of insanity, they are sent to an insane hospital, and cannot be removed but by an order of the court? This is not the way to administer law—the guilty should be punished—and, besides, the actual operation of such a system has been very demoralizing, for we see the same witnesses, experts and others, very shortly after the person is incarcerated in the insane asylum, upon petition, showing by their testimony a restoration to health and mental soundness in an extraordinarily short space of time, and they are thus set free to again prey upon society and endanger other lives. Nor can a judge stop this, for upon proof of sanity he will be compelled to liberate. Those beings, who live with these unsettled minds, who are not taken care of by friends, relatives or the State, when caught in the act of crime must be punished, or else they grow in their boldness and badness, so that, instead of insane delusions, they become, in the language of the old common-law indictments, 'moved and seduced by the instigation of the devil' to the commission of crime. Many learned and great men have been subjects of insane delusions, and that, too, while occupying high political and social positions; but it was never dreamed that, in other respects, they were not perfectly sane, and even accountable for the delusions, for when they felt they were beyond law they would indulge their caprices. When they felt the presence of law then these delusions would be restrained. So a public conviction of one of the class of the prisoner is of considerable force as a restraining element upon such persons. Experience shows that following an ac-

quittal of some notorious criminal upon the ground of insanity numbers of like deeds are committed and the cranks exult."

The utterances in the charge brought to our attention by the second assignment of error are greatly to be regretted. The trial was of the most solemn character known to the law, which sternly called for the life of the prisoner if he was sane, but humanely spared it if he was not. By the common law and by our penal code the plea of insanity made for him, if sustained by competent testimony, stayed the punishing hand of justice, but the jury were told that he was "of a class vulgarly called cranks," and that "those beings, who live with these unsettled minds, who are not taken care of by friends, relatives or the State, when caught in the act of crime must be punished." This is not, and never was, the law, here or in England, since the repeal of a bloody statute passed in the reign of Henry VIII, which enacted that one found guilty of treason should be sent to the gallows, even if he became mad after his conviction. Instead of being tried according to law, the prisoner was tried against it, for the only defense which could have been made for him, and which the law distinctly recognizes as a complete one, if established by fairly preponderating evidence, was denied him by the trial judge. It was for him to guide the jury in making a true deliverance; but he misguided them and, in effect, told them to disregard the lawful defense made for the appellant. Further discussion could not make this clearer.

The second assignment of error is sustained and the judgment reversed with a venire facias de novo.