Commonwealth *v*. Karmendi, Appellant.

322

Argued May 17, 1937; reargued October 1, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Frank J. Reiser, Sr.,* with him *Frank B. Warfel,* for appellant.

*Robert J. Puderbaugh,* Assistant District Attorney, with him *Chester B. Wray,* District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE KEPHART, November 12, 1937:

Margaret Karmendi was found guilty of the murder of her three-and-a-half-year-old boy and sentenced to death. She had been indicted with Roy Lockard for the same offense but was separately tried. This was her second trial. Her first conviction was reversed in 325 Pa. 63, and a new trial granted. Her companion, Roy Lockard, found guilty of the same offense, with the same punishment, had also appealed. The judgment was sustained in *Com. v. Lockard,* 325 Pa. 56. Mrs. Karmendi appeals from her second conviction. We are now reviewing the facts for the third time.

The chief ground of complaint is that there was not sufficient evidence to warrant conviction. In reviewing the record of a conviction for murder under the Act of February 15, 1870, P. L. 15, as it is our duty so to do,

we are to determine solely whether the degree or elements of murder in the various degrees are present. In this grave accusation we review only the Commonwealth's case. We do not approach the question as if we were jurors deliberating on the weight of the evidence or the credibility of the witnesses, nor as jurors would do under the facts as developed. Nor do we approach it with a fear that we might possibly find the elements of first degree murder to be in the record, and hesitate in our duties because it involves the death penalty. Nor do we consider it with a desire to avoid the unpleasant duty of finding the elements present. Our simple question, one that has been passed on by this court often before, is this: Are the elements of first degree murder present? In other words, was there sufficient evidence, direct or circumstantial, from which the jury might find beyond a reasonable doubt a homicide of the first degree, committed by the accused? In so doing, we do not consider evidence of the prisoner which, if believed, might show innocence: *Com. v. Danz,* 211 Pa. 507.

In convictions for murder, the sole, absolute and final responsibility for the verdict and its consequences rests with the jury. That responsibility comes from the performance of a public duty of the highest importance and is assumed when all the testimony, pro and con, is weighed and considered by them and a decision reached. Their conclusion cannot be reversed or set aside by this Court unless there has been a trial mistake, or the evidence is insufficient to sustain the verdict as a matter of law.

With this thought in mind we must review the evidence, first stating the State's position in the trial. The Commonwealth's theory of the case is that there was a plot to get rid of the child by Lockard and the accused. The child was in their way. There was time for premeditation, preparation, deliberation and action. To cover up their offense it was to be so arranged that death was

to take place on a highway when an automobile was passing, and to be inflicted in such a way that the unknown motorist should be charged with striking and killing the boy. To sustain this theory, the Commonwealth rests its case for conviction on these grounds: (1) That the accused must have committed the crime as she was the only person logically in a position to commit it; (2) that her statements and admissions show that even if Lockard committed the killing she participated in the crime; (3) that when she was accused of the crime by Lockard, she so demeaned herself as to admit it. Ancillary to these three basic grounds, the Commonwealth submitted evidence of the unnatural conduct of the accused at the time of the killing and which persisted afterward even to the time of trial.

We will now state briefly the salient points of the evidence, which are not disputed. Margaret Karmendi, a married woman, her husband working in a silk mill, met Roy Lockard sometime before April 21, 1936, possibly eight months or so before the crime. There were many disagreements between the accused and her husband and they had been separated. No illicit relations between the accused and Lockard were shown, but it did appear that their friendship was unknown to the husband, and on the days when they met she returned to her home before her husband came back from work. On at least one occasion the child had told his father that on his walk to the town with his mother she had had a conversation with a man. An acquaintance grew up between them, and about 5:15 on the afternoon of April 21st they met. The little boy was with them. They walked to the Lockard home on the outskirts of the City of Altoona to get his coat, after which they went down toward the center of town, reaching 11th Avenue and Bridge Streets about 7:30; from there they proceeded to the Pennsylvania Railroad Station, where they remained until about 9:00 o'clock in the evening. Leaving it, they went up 10th Avenue, crossed Bridge Street to 17th Street, thence to

Jaggard Street. Lockard was carrying the boy. A short distance down Jaggard Street they waited for about five minutes. An automobile came down Jaggard Street from First Avenue, and, as the automobile passed, the top of the boy's skull was crushed in by a heavy railroad spike. We follow the steps of the actors, after the crime, from the testimony of several witnesses.

Lockard picked the child up and went over to the house of a neighbor, Paul Iorio, a short distance away. There, in response to a scream from defendant, Iorio opened the door. The accused and Lockard were before him. Lockard said in appellant's presence "Let me get in. The baby got hurt by an automobile." The automobile was described by Lockard as a Ford or a Chevrolet, '33 or '34, black coupé. It was variously described thereafter by both of them. Appellant also attributed the baby's wounds to an automobile accident. Other incidents took place in that house which will be later described. The child remained at Iorio's a short time. It was still living and was taken by Lockard in a truck to the Mercy Hospital. It died in a few hours. Appellant did not go with it to the hospital. She remained at the Iorio home.

When officer Wininger and police reporter Wertzberger went back with Lockard to the Iorio home from the hospital to see the accused, both she and Lockard insisted the child was killed by an automobile. She described carefully how the accident happened. She said that she and Lockard were walking with the boy on Jaggard Street, on the west side of the Avenue. Lockard was carrying the child; his head was resting on Lockard's shoulder, with his arms around Lockard's neck. The car came up, swerved and struck the boy's head as it rested on Lockard's shoulder. Neither Lockard nor the accused were injured because they were standing together and were away from the car. She and Lockard pointed out the exact place where the "accident" occurred, and described when and how it happened. The

accused, after leaving the Iorio home, when Lockard was away from her, told the same story in the place where she telephoned to a doctor, and also where she called the hospital. When she notified her husband, she told him the same thing. She repeated this the next day at her mother-in-law's house to persons there. She seemed in rather a pleasant mood when Officer Flynn called to see her that day, and repeated the same tale about the automobile to him, saying that she had noticed the car again after the accident, and that a black cloth had been placed over the license plate so that it could not be known. Later that day, about 9:30 in the evening, when Flynn returned he said: "I know who killed your boy, Margaret." "You do?" she exclaimed. "Did you get the fellow? Was there two in the car?" He replied "I don't know who they were." There is no disagreement that the foregoing recital of facts actually took place. Lockard, when away from the accused, made similar statements, until the next day, that is the 22nd, when he made the first statement accusing this woman of the crime.

It is admitted the child was murdered in the manner first described. The automobile theory was amply disproved by the evidence, and was subsequently abandoned by the accused. For it she substituted a statement that Lockard actually brained the child with a spike, without her connivance or consent, and that after Lockard struck the boy he told her to say it was an automobile that hit him, threatening that if she did not tell that story she would receive the same treatment. But from the time of the striking of the blows, until they reached Irorio's home, did they have time to work up the details as to how, when and where, an automobile sideswiped the child, with a full account of the accident? The accused was separated from Lockard shortly after they went into Iorio's home. After his return from the hospital she was there but a short time before he left, and did not see him again until confronted by him the

following night at about ten o'clock in the district attorney's office. While the record shows a friendship, it does not exhibit anywhere control by him.

The jury could consider the fabricated automobile incident as some evidence of guilt, not sufficient in itself to show she struck the fatal blow, but tending to show participation. Its purpose was to conceal the truth. Many decisions of this Court have held that the making of false and contradictory statements by the accused, with the intent to mislead the police and divert inquiry or suspicion, is indicatory of guilt: *Com. v. Spardute*, 278 Pa. 37, 43; *Com. v. Jones*, 297 Pa. 326, 333; *Com. v. Danarowicz*, 294 Pa. 190, 193; *Com. v. Hadok*, 313 Pa. 110. In *Com. v. DuBoise*, 269 Pa. 169, it was said at page 174: "What the accused said, as much as the things he did, on the night of the crime, were circumstances in the case to be considered by the jury in determining the question of his guilt or innocence. If when he spoke he spoke falsely, as he admits he did, concerning certain of the incidents of that night, the jury was entitled to consider these false statements and to draw from them the conclusion that his purpose in telling the untruths was to conceal the truth, and that his reason for the concealment of the truth was that he knew, if told, it would injure him." The jury would be justified in inferring that the telling of this false story by the mother of the helpless victim was not only inconsistent with her denial of complicity but so unnatural under the circumstances as to point toward guilt. The accused attempted to justify her falsehood by attributing it to fear created by Lockard's threat to kill her, unless she concealed the truth. But she clung to the story tenaciously when she was safely out of his presence, when she was surrounded by her family and when she was in the safe custody of the police. This circumstance in itself does not show the innocent conduct of a bereaved mother, restrained by terror from denouncing the murderer of her baby. It was a very important factor in the case.

This brings up one of the most important parts of the evidence as it relates to the killing. The Commonwealth contends that the accused must have committed the crime because she was the only person who could possibly have committed it under her own story and her admissions.

Returning to the trip from the railroad station, the testimony shows that after they walked up First Avenue and turned right on Jaggard Street, Lockard carrying the boy, they went down Jaggard Street a short distance. The child was on his left shoulder, the baby's arms were around his neck. His face was towards Lockard's. His head would extend over the shoulder. This defendant was walking on the side of the road and to Lockard's left, and as the light of a car approached she stepped one pace behind Lockard and followed him down the street. Lockard had the railroad spike in his *left* side pocket. When 42 to 50 feet from the corner, they stopped. She says that with the child in that position, Lockard took the pin from his pocket, and with his *right* hand, while the automobile was passing, crushed in the top of the child's head. The Commonwealth contends this was a physical impossibility and that the accused was the only person who could and did take the spike and strike the child. This it is urged is what was done, she being behind Lockard, with the baby's head exposed to her attack.

This character of circumstantial evidence furnishing a natural inference, indicative of culpability, was for the jury. Its evidentiary force depends on the strength of the inference from the proven facts. If the jury believed the foregoing facts concerning the position of the actors, a strong inference, under the rules governing circumstantial evidence, would point to the guilt of the accused. To hold otherwise would destroy one of the foundations of circumstantial evidence. Here we have only two persons at the place where the crime was committed. The evidence clearly establishes the respective positions

of the parties, the position of the child on the man's shoulder. The child was struck a blow that crushed the top of his skull, making a wound four inches long and an inch deep. Under this evidence it would have been extremely improbable for Lockard to have struck this blow and crush the skull as testified, inflicting cuts in the front and cuts in the back of its head, beginning just back of the hair line and extending back from the center line of the head, four to five inches long. It is true that there were contradictions as to the position of the child in later statements of the accused. She stated at one time that the boy was on Lockard's left shoulder, and, in a subsequent written statement, that it was on his left arm on the shoulder and was in the latter position when he struck it. In her last statement she said that Lockard put the boy down, stood for about five minutes until an automobile came along, and, just as it passed, struck the boy with the heavy spike. All these statements were for the jury, as were the contradictions. She, without any question, put herself in a position where it could be reasonably inferred that she struck the fatal blow, but as we indicated above, these were all matters for the jury to determine. It was such evidence that, if believed, could fasten guilt on her.

The Commonwealth's next contention is that the accused actually participated in the crime if she did not alone commit it, deriving this theory from her own story of exculpation, and her conduct after the slaying. It is only necessary to quote from her transcribed statement, remembering what we have said above as to the position of the boy on Lockard's shoulder. Here she related that Lockard briefly exhibited the spike to her as they left the station. She stated, after describing the length of the pin and its form—one inch in diameter and approximately six inches long—that Lockard said: "Something will happen to-night." She inquired his meaning.

"Q. What was his answer to that?

A. 'It is my business.'

Q. When you got to First Avenue and Jaggard Street, what was his actions there in reference to looking at you?

A. He just stared at me.

Q. You started down the hill to the Pleasant Valley road?

A. Yes.

Q. Was you walking fast or slow?

A. Slow.

Q. Who was in front?

A. Me.

Q. Who had the boy in arms?

A. He did.

Q. About how far ahead of him was you?

A. About a step.

Q. When you got across the street—you know where the Iorio place is?

A. Yes.

Q. When across the street from his place what did he do? Did he take this pin out of his pocket?

A. Yes.

Q. Which pocket did he take it out of?

A. Left-hand side.

Q. He had the pin in which hand?

A. Right hand.

Q. Did you say anything to him?

A. No.

Q. Did you ask him what he was going to do?

A. No.

Q. What did you say to him?

A. Nothing.

Q. Did you say to him 'What are you going to do'?

A. Yes.

Q. What did he say then about business?

A. Said 'that is his business.'

Q. Which way did he turn?

A. Had his back turned up toward the road.

Q. Then what did he do? Did you hear any sounds?

A. Yes.

Q. What was it?

A. Something rattling.

Q. He had the boy in his arms all the time?

A. Yes.

Q. Did you hear the child cry out?

A. He moaned.

Q. What did you do when you heard the moan?

A. I did not do anything—just standing there.

Q. Did you run across the road then?

A. Yes.

Q. Did you look back toward him?

A. Yes.

Q. What did you say then (is the boy dead)?

A. Yes.

Q. What did he say in answer to that?

A. Said he is still breathing."

A little later:

"Q. You heard a sound like something striking?

A. Yes.

Q. The baby moaned?

A. Yes.

Q. You ran across the street and turned around?

A. Yes.

Q. That is when you made the inquiry as if the baby was dead?

A. Yes.

Q. He said it was still breathing?

A. Yes."

This recital, reinforced by her conduct in attributing the brutal injury to an automobile, is certainly evidence from which the jury might find that she knew what was going on. By her own admission Lockard had exhibited to her in a sinister manner the spike; yet she maintains that no suspicion was aroused. By her own admission she not only failed to rush to the defense of her baby when Lockard was striking it, or to fight with the murderer, but rather she left him and ran across the road.

She did not go to the child to comfort it or to determine the extent of its injury, but contented herself with calling to Lockard and asking if it were dead. The fact that immediately after the attack on her child she told a collected narrative, in some detail, of an accident, would justify the jury in believing, from her own statements, that the story could not have been agreed upon or fabricated in the short space of time that elapsed if she had been, as she said, completely ignorant of Lockard's purpose until the blows were struck.

Another factor creates an inference of guilty knowledge, and that is her identification at police headquarters, the following day, of the type of spike used in the commission of the crime. By her own story Lockard had exhibited this spike to her but once, after nightfall, and had hurled it away when the last blow was struck. Yet she was able to immediately indicate from several railroad spikes the one resembling the murder weapon. This fact points to a greater familiarity with the spike used in the crime than her statement would warrant.

All of the circumstantial evidence produced by the Commonwealth was sufficient to carry this case to the jury. In cases such as this, where direct proof is impossible, circumstantial evidence must be used to establish the crime. The fact that it is circumstantial does not detract from its value as evidence. In an early case, *Com. v. Harman,* 4 Pa. 269, Chief Justice GIBSON said, at page 271: "No witness has been produced who saw the act committed; and hence it is urged for the prisoner, that the evidence is only circumstantial, and consequently entitled to a very inferior degree of credit, if to any credit at all. But that consequence does not necessarily follow. Circumstantial evidence is, in the abstract, nearly, though perhaps not altogether, as strong as positive evidence; in the concrete, it may be infinitely stronger." There is no general rule to determine the quantity of circumstantial evidence necessary to overcome the presumption of innocence and carry the

case to the jury. This must be weighed by the trial judge: *Com. v. Bone,* 64 Pa. Super. Ct. 44, 48; *Com. v. Benz,* 318 Pa. 465. The general rule as to circumstantial evidence was stated in *Brown v. Schock,* 77 Pa. 471, at page 479: "It is the right of the party to have this submitted to the jury, unless it be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances." In *Com. v. Benz,* supra, it was said at page 472: "The evidence must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but must be inconsistent with his innocence." Certainly the evidence of the Commonwealth shows facts apparently inconsistent with the innocence of this accused, though it was for the jury to determine the degree of inconsistency. The facts, directly or by inference, suggested a motive for the destruction of the child, placed the accused at the scene of the crime, indicated either actual participation or guilty knowledge in its perpetration, and suggested its prearrangement. All these circumstances, the deliberation, the waiting for five minutes until a car came along, the fatal blow struck either by Lockard or the accused, make out a case from which the jury could find first degree murder. Convictions have been sustained in cases where the character of the circumstantial evidence was no stronger: *Com. v. Smith,* 270 Pa. 583; *Com. v. Danz,* supra; *Com. v. Johnson,* 162 Pa. 63. In the *Smith* case the facts showed a child was taken by its parents to a lonely spot and its head crushed by a stone. The accused father insisted that the child died as the result of a fall and there was no testimony to contradict him, save the inferences arising from the proof of the nature of the wounds. These were such as to make it next to a physical impossibility for the injury to have occurred as related. The evidence in the *Johnson* case was entirely circumstantial; a child

last seen in the custody of its father was subsequently found drowned. The father told false and contradictory stories to exculpate himself, and these, with evidence of a motive and the fact that death could not have been accidental, were sufficient to convict. In the *Danz* case, the widow was convicted two years after the death of her husband, for poisoning him. The fact of death from poison was shown and that the widow had purchased such poison prior to the husband's death. No motive could be proved, nor was the manner of the perpetration of the crime shown, but the jury found her guilty of murder, and the judgment was affirmed.

There is a third proposition. The evening after the murder, on the 22nd, the parties were brought together in the district attorney's office. There Lockard, in her presence, accused Mrs. Karmendi of killing the child. The evidence shows that she did not reply, she simply "sneered at him" and later said the automobile did it. Later on, in police headquarters when the two were together, each accused the other of committing the crime. The Commonwealth urged that her failure to deny the killing when first accused by Lockard was an admission, or evidence from which an admission could be found by the jury. The failure of the accused to deny this statement was unusual under the circumstances. She had full opportunity to do so, and the natural reaction of an innocent mother would have prompted an instant and vehement repudiation of the charge. Whether her conduct was such as to amount to an admission was a question for the jury to determine. It is well settled that the acquiescence of an accused to a statement made in his presence will be given the effect of an admission (see *Com. v. Ballon,* 229 Pa. 323) provided there is motive or opportunity to deny: *Com. v. Zorambo,* 205 Pa. 109; *Com. v. Mazarella,* 279 Pa. 465. Here, if the accused were innocent, there was ample motive to deny. Ordinarily silence when one is charged with a crime should not be received as evidence of guilt and is not admissible

for any purpose unless there is other evidence in the case from which guilt may be inferred. But where there is such evidence as in this case, "silence" when accused of the crime becomes itself evidence. This putative admission of itself was not sufficient to fix guilt, but with the other evidence in the case submitted by the Commonwealth the jury could consider it.

Superimposed on all the evidence, and ancillary thereto, we have the conduct of the accused after the fatal blows were struck. It is true when she went on the Iorio porch she screamed, but this was consistent with the plan to blame the slaying on an automobile accident. When the child was taken into the Iorio home, it was placed on a davenport. The accused never went near it. She neither kissed it nor ministered to it; she was calm, cool, collected and even indifferent throughout the time she was at the house. At one stage, she went into the kitchen with Lockard, where they put their arms around each other, and she inquired whether the baby would live. Lockard said he thought it would. There were no tears shed, no emotions exhibited. When she went to telephone the doctor, her demeanor was the same as it was when she went to the restaurant to call her husband. She was not excited nor crying at either place, nor was she when she met a neighbor on her way home. At the undertaker's the next day she showed no emotion whatever. She did not ask to see the baby. According to the Commonwealth's evidence she displayed such callous indifference that the undertaker remonstrated with her. The same day, the 22nd, when she was at her mother-in-law's house, with many people around, according to Officer Flynn, she was in a very happy frame of mind and appeared to be elated.

This is the Commonwealth's evidence. The jury might infer from such conduct actual depravity of heart and an unmotherly disposition. It might indicate a low degree of sensibility. These facts were for the jury. The conduct of an accused after the commission of a crime,

which tends to show guilt, may throw light upon the intention of the accused: *Com. v. Luccitti,* 295 Pa. 190; *Com. v. Danarowicz,* supra; *McMeen v. Com.,* 114 Pa. 300, 306. Where the deceased stands in a position of close relationship to the party accused, the latter's indifference or calloused behavior may be shown as circumstantial evidence. Thus in *Com. v. Jones,* supra, the defendant displayed complete indifference to the absence of his wife prior to the discovery of her murder, and in *Com. v. Danz,* supra, the widow made no concealment of her satisfaction over the death of her husband. In both cases this unusual conduct was treated as part of the evidence.

From all the facts in the record before us we conclude that the ingredients of murder in the first degree are present. The jury has found the accused guilty of murder in the first degree, and fixed the penalty at death. The evidence, though circumstantial, was not legally insufficient. It is not possible for this court to interfere with that finding and penalty unless there is a trial mistake. We now consider the second branch of the case.

We may dismiss all other assignments of trial errors as being without merit or as already answered. The last assignment must be sustained; that is, the court erred in not granting a change of venue. The Act of March 18, 1875, P. L. 30, fourth paragraph, provides: "When upon a second trial of any felonious homicide the evidence on the former trial thereof shall have been published within the county in which the same is being tried and the regular panel of jurors shall be exhausted without obtaining a jury," the venue may be changed on the application of the defendant. An application was made in strict conformity to the act. The act is not mandatory; it lies within the sound discretion of the court below: *Com. v. Cleary,* 148 Pa. 26, but in a particularly notorious case in a given community, this court

will review that discretion, and if in its judgment it is felt the accused could not help but be prejudiced in her subsequent trial by the feeling engendered, a new trial will be granted. The people's minds were inflamed when the press carried the horrid details of the crime and particularly so when the conduct of this defendant was related. One might remark, "any jury in Blair County will send that woman to the electric chair." That is not the proper spirit for a jury. They may do it, when the evidence on both sides is carefully considered, and so may a jury of another county, but this is quite different than the prevailing opinion in that county: "She is guilty." While ordinarily we would hesitate to place the burden of an additional trial on this county, justice must prevail regardless of expense. We sustain this assignment of error, and order and direct a change of venue to Cambria County.

Judgment reversed; a venire facias de novo awarded; an order for change of venue is forthwith filed.

SEPARATE OPINION OF MR. JUSTICE DREW:

I agree with the conclusion reached in the majority opinion. To me it is quite clear that defendant is entitled to a new trial, with a change of venue.

That the local newspapers carried highly inflammatory accounts of the crime and of the subsequent conduct of the accused is admitted. The shocking details revealed upon the first trial were published in full throughout the county. If an intense feeling of opposition among the citizens generally had not been completely and successfully kindled prior to the first trial such was certainly the aftermath. Moreover, one of our reasons for reversing the first conviction was the probable prejudice resulting from the charge of the court. This aroused public sentiment and animosity persisted when defendant was called for trial the second time. Public opinion had become so fixed that the regular

panel of jurors was exhausted before a jury was obtained.[1]

Under the circumstances, defendant's application for a change of venue should have been granted. The first section of the Act of March 18, 1875, P. L. 30,[2] conferred that right; in my opinion, the fourth paragraph of that section in specific language made it mandatory. It is true that a majority of this court held in *Com. v. Cleary,*

---

[1] Of the thirty-nine prospective jurors on the regular panel, eleven were excused because they had formed opinions which they could not change. Of forty-one talesmen who were examined before the jury was completed, thirteen were excused for the same reason. Approximately one-third of the jurors called to try defendant stood up in open court and said they had fixed opinions derived from reading the newspapers and hearing the case discussed which they could not and would not change. The examination of the testimony taken on voir dire reveals a remarkable fixity of opinion; the crystallization of public sentiment is apparent.

[2] That section is as follows: Be it enacted, &c., That in criminal prosecutions the venue may be changed, on application of the defendant or defendants, in the following cases:

*First.* When the judge, who by law is required to try the same, is a near relative of the prosecutor, or of the defendant, or of the person injured, or has knowledge of facts which make it necessary that he should be a witness in the case.

*Second.* When, upon the application of a defendant in a felony, it is made to appear to the satisfaction of the court, that from undue excitement against the prisoner, in the county where the offense was committed, a fair trial cannot be had, or that there exists in that county so great a prejudice against him that he cannot obtain a fair trial, or that there is a combination against him, instigated by influential persons, by reason of which he cannot obtain a fair trial.

*Third.* When upon the trial of any criminal case an unsuccessful effort has been made to procure and empanel a jury for the trial of the defendant, and it shall be made to appear to the court by the written affidavit of some credible witness that a fair trial cannot be had.

*Fourth.* When upon a second trial of any felonious homicide the evidence on the former trial thereof shall have been published within the county in which the same is being tried and the regular panel of jurors shall be exhausted without obtaining a jury.

148 Pa. 26, and the same is now being done here, that
the latter paragraph was merely discretionary with the
trial court. With this interpretation I cannot agree. If
necessary I would overrule the case on that point for the
unanswerable reasons given by Mr. Justice STERRETT in
his dissenting opinion. It seems to me that where the
requirements of that paragraph are present, as they are
here, the need for a change of venue cannot be doubted,
and the legislature has said that it should be granted as
a matter of course. The first paragraph is undoubtedly
mandatory; I think the fourth paragraph equally so.

Even if the view of the majority is to be accepted and
the fourth paragraph is to be held to be merely permis-
sive, as the second *(Com. v. Buccieri,* 153 Pa. 535; *Com.
v. March,* 248 Pa. 434; *Com. v. White,* 271 Pa. 584;
*Com. v. Skawinski,* 313 Pa. 453) and third *(Com. v.
Allen,* 135 Pa. 483) have been held to be and undoubt-
edly are, leaving the matter to the discretion of the
trial court, I think that discretion was palpably abused
in the present case. When a defendant is about to be
put on trial for life in a locality with a background
such as was here present, any discretion vested in the
trial court to grant a change of venue should be quickly
and courageously exercised. It should not be forgotten
that only a few months ago in *Com. v. Reilly,* 326 Pa.
56, the circumstances of which were quite similar to the
present, this court ordered a change of venue under the
fourth paragraph.

The right of one challenged to defend her life to a fair
and impartial jury is fundamental. It is a right secured
by our Declaration of Rights, in the safeguarding of
which any doubt should be resolved in favor of the ac-
cused.

This disposition, however, does not make necessary a
consideration of the evidence to determine whether or
not it will support a conviction of first degree murder.
Such a determination is as irrelevant now as it would
have been when the case was here upon appeal from the

earlier conviction. We have never, when reversing for reasons other than inadequacy of evidence, made such a determination.[3] In the present situation I think it not only contrary to precedent, but highly prejudicial to the

[3] The following is a list of all cases since the passage of the Act of February 15, 1870, P. L. 15, in which first degree convictions were reversed for reasons other than inadequacy of evidence. In none did the court determine whether the essentials of first degree murder had been made out: *Com. v. Karmendi*, 325 Pa. 63; *Com. v. Zukovsky*, 324 Pa. 588; *Com. v. Clark*, 322 Pa. 321; *Com. v. Miller*, 313 Pa. 567; *Com. v. Brown*, 309 Pa. 515; *Com. v. Williams*, 309 Pa. 529; *Com. v. Williams*, 307 Pa. 134; *Com. v. Westley*, 300 Pa. 16; *Com. v. Epps*, 298 Pa. 377; *Com. v. Madaffer*, 291 Pa. 270; *Com. v. Thomas*, 282 Pa. 20; *Com. v. Stallone*, 281 Pa. 41; *Com. v. Jones*, 280 Pa. 368; *Com. v. Mazarella*, 279 Pa. 465; *Com. v. Puglise*, 276 Pa. 235; *Com. v. Gibson*, 275 Pa. 338; *Com. v. Valeroso*, 273 Pa. 213; *Com. v. Ferko*, 269 Pa. 39; *Com. v. Loomis*, 267 Pa. 438; *Com. v. Berkenbush*, 267 Pa. 455; *Com. v. Tompkins*, 267 Pa. 541; *Com v. Ross*, 266 Pa. 580; *Com. v. Tompkins*, 265 Pa. 97; *Com. v. Palome*, 263 Pa. 466; *Com. v. Divomte*, 262 Pa. 504; *Com. v. Corsino*, 261 Pa. 593; *Com. v. Principatti*, 260 Pa. 587; *Com. v. Haines*, 257 Pa. 289; *Com. v. Ronello*, 251 Pa. 329; *Com. v. Vitale*, 250 Pa. 548; *Com. v. Morgenthau*, 249 Pa. 139; *Com. v. Croson*, 243 Pa. 19; *Com. v. Simanowicz*, 242 Pa. 402; *Com. v. Marcinko*, 242 Pa. 388; *Com. v. Ronello*, 242 Pa. 381; *Com. v. Andrews*, 234 Pa. 597; *Com. v. Green*, 233 Pa. 291; *Com. v. Watson*, 233 Pa. 295; *Com. v. Colandro*, 231 Pa. 343; *Com. v. Molten*, 230 Pa. 399; *Com. v. Polichinus*, 229 Pa. 311; *Com. v. Chapler*, 228 Pa. 630; *Com. v. Greene*, 227 Pa. 86; *Com. v. Hoover*, 227 Pa. 116; *Com. v. Fisher*, 226 Pa. 189; *Com. v. Lee*, 226 Pa. 283; *Com. v. Fisher*, 221 Pa. 538; *Com. v. Smith*, 221 Pa. 552; *Com. v. Cate*, 220 Pa. 138; *Com. v. Curcio*, 216 Pa. 380; *Com. v. Frucci*, 216 Pa. 84; *Com. v. Ieradi*, 216 Pa. 87; *Com. v. Johnson*, 213 Pa. 607; *Com. v. Fellows*, 212 Pa. 297; *Com. v. Zorambo*, 205 Pa. 109; *Com. v. Farrell*, 187 Pa. 408; *Com. v. Wilson*, 186 Pa. 1; *Com. v. Gerade*, 145 Pa. 289; *Com. v. Cleary*, 135 Pa. 64; *Com. v. Clark*, 130 Pa. 641; *Hilands v. Com.*, 111 Pa. 1; *Abernethy v. Com.*, 101 Pa. 322; *Coyle v. Com.*, 100 Pa. 573; *Goersen v. Com.*, 99 Pa. 388; *Zell v. Com.*, 94 Pa. 258; *Pannell v. Com.*, 86 Pa. 260; *Pistorius v. Com.*, 84 Pa. 158; *Meyers v. Com.*, 83 Pa. 131; *Murray v. Com.*, 79 Pa. 311; *Staup v. Com.*, 74 Pa. 458; *Brown v. Com.*, 73 Pa. 321; *Shaffner v. Com.*, 72 Pa. 60.

accused, to pass upon the evidence. To do so, it seems to me, is to pre-judge the evidence upon which she will be retried. It is a distinct prejudice to say now that that evidence is sufficient to convict her of first degree murder. This is a departure from what has been done in the past under similar circumstances, it is unwarranted by the Act of February 15, 1870, P. L. 15, and I do not approve it.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

I concur in the majority opinion in its overruling of all the assignments except the assignment which was filed belatedly and "nunc pro tunc," and which is based upon the denial of a change of venue. In my judgment, *this assignment is also devoid of merit and should be overruled.* In appellant's statement of "Questions Involved," in the assignments of error filed before this case was argued, and in the oral argument before this court, nothing was said by anybody about a change of venue. Only in appellant's typewritten "supplemental argument" is there any reference to a change of venue and this states that the assignment of error based upon a denial of a change of venue had been filed later. Apparently this alleged error was an afterthought.

The question to which this protracted legal controversy has been addressed is: "Did the Commonwealth offer evidence sufficient to prove, beyond a reasonable doubt, Margaret Karmendi guilty of murder in the first degree?" I would not vote to sustain a conviction unless in my mind the proof of guilt was legally and morally adequate beyond any reasonable doubt.

I wish to record my reasons for the belief that the verdict rendered was based on evidence measuring up to the high standard the law justly requires.

Wigmore in his second edition of Evidence, Vol. 1, sec. 27, aptly says: "The conclusions and tests of everyday experience must constantly control the standards of legal logic." Professor Thayer in his "Preliminary

Treatise on Evidence at the Common Law," says (p. 272) : "What is called the 'legal mind' is still the human mind, and it must reason according to the law of its constitution."

I cannot see how the human mind, applying "the tests of everyday experience," can fail to reach in this case the conclusion that twenty-four men and women as jurors in two successive trials reached, to wit, that the defendant is guilty of the murder of her own child. The probative value of conduct evidence has always been recognized and it finds expression in the universal proverb that "actions speak louder than words." Solomon's reputation as a wise man and judge is based to a considerable extent on the fact that he determined which of two women was the mother of a certain child by applying a conduct test.[1]

Dramatists plumbing the depths of human psychology have portrayed *conduct as revelatory of guilt.* One of the greatest of them declared: "Unnatural deeds do breed unnatural actions; infected minds to their deaf pillows will discharge their secrets."[2]

---

[1] The report as found in the 1st Book of Kings, III, 16, sets forth that two women appeared before King Solomon, each with a plausible tale to the effect that the other's child had died and that the baby which survived was hers: "Then said the king: 'The one saith: "This is my son that liveth, and thy son is the dead"; and the other saith, "Nay; but thy son is the dead, and my son is the living." ' And the king said, 'Bring me a sword.' And they brought a sword before the king. And the king said, 'Divide the living child in two, and give half to the one and half to the other.' Then spake the woman whose the living child was unto the king . . . and said, 'O my lord, give her the living child, and in no wise slay it.' But the other said, 'Let it be neither mine nor thine, but divide it.' Then the king said, 'Give *her* the living child, and in no wise slay it: *she* is the mother thereof. And all Israel heard of the judgment . . . for they saw that the wisdom of God was in him, to do judgment."

[2] Able commentators on Shakespeare have pointed out that certain remarks made by Lady Macbeth, who was privy to Duncan's murder but who feigned innocence, really amounted to a revelation of guilt. A short time after the murder and when the alarm bell

It is unthinkable that Lockard would have elected to kill the child in the mother's presence, *unless she was a partner in his criminal purpose.* It is unthinkable for these reasons. If he was friendly with her (as he unquestionably was) he would not, except upon the hypothesis stated, have been diabolical enough to torture her by making her witness her child's slaying. Whether friendly *or unfriendly* with her, he would not, except upon the hypothesis stated, have been willing to incur the risk of her disclosure of the murder. Any normal mother having witnessed her child's slaying to which she was *not* a party, would avail herself of the first opportunity to accuse the slayer and have him apprehended. Mrs. Karmendi was obviously a party to the slaying of her child, her motive being to save herself from the observations and reports of the child to its father, of incidents which Mrs. Karmendi preferred to have undisclosed. That the child was already "telling things" to his father was proved. If *Lockard alone* had desired to kill the child, he *alone* would doubtless have taken him for a walk and killed him and then attributed the death to the same kind of an "accident" both he and Mrs. Karmendi conjured up here.

The defendant's conduct at and after the killing of this little boy is reconcilable with no hypothesis except one involving her as particeps criminis. This inculpatory conduct may be summarized as follows:

---

was rung, she appeared upon the scene and asked what had happened, though *in fact* she, as a party to the murder of Duncan, *well knew what* had happened. At this moment Banquo comes upon the scene and MacDuff cries out to him: "Our royal master's murdered." Lady Macbeth then cries out: "What! *In our house!*" A commentator says of this: "Had she been innocent, her horror of the crime would have made her forget *the place.* Banquo sees through this and sees through *her.* Her expression was a light by which he saw her guilt—and he answers: 'Too cruel *anywhere.'*" In other words, he reproached her by saying in effect: "This murder of Duncan in which you had a part was *dastardy regardless of its place of commission.*"

1. When she saw Lockard striking her own flesh and blood with a heavy railroad spike, she, instead of rushing to the little child's defense as even an animal would do in defense of its young, ran across the road.

2. Instead of then going back to aid the child or summoning or crying out for an officer or other person, she merely inquired of Lockard: "Is the boy dead."

3. Upon being informed by Lockard that the child was "still breathing" she did not attempt to minister to it either then or a little later when it was in the Iorio home.

4. When the child was shortly afterwards taken to the hospital from the Iorio home, where it was first carried by Lockard, with the lying information that "the baby got hurt by an automobile," the defendant did not accompany it.

5. When officers later interrogated Lockard and the defendant in the Iorio home, both she and he *insisted* that the child had been struck by an automobile, she describing *with much detail* just how the "accident" happened.

6. She repeated the same false story after she and Lockard had separated and when she was therefore not under any physical duress of his.

7. She later repeated the same false story to her husband and on the next day to other persons, Lockard not being present on either occasion.

8. In the kitchen of the Iorio home, within a short time after she had seen Lockard murder her child, she and Lockard "put their arms around each other."

9. She gave a complete and accurate description of the spike with which the killing was done, thus revealing familiarity with the spike *before* it was used by Lockard to kill the child, for the spike was, after the murder, thrown away.

10. When Officer Flynn told her, "I know who killed your boy," she made no inquiry as to the killer's identity.

11. When on the evening after the murder she and Lockard were together in the district attorney's office, and Lockard accused her of killing the child, she merely

"sneered at him" and a little later said: "The automobile did it."

12. The minute details of Mrs. Karmendi's fabricated story of the killing indicate that it was fabricated *in advance* of the killing. No false report is replete *with minute details* unless considerable time was given to its preparation. It is a psychological fact that the inventive powers of the human mind operate much more slowly than the power of recollection. When Mrs. Karmendi narrated the details of her fabrication, she was palpably telling a story that had been invented and rehearsed in advance by herself and Lockard.

What this woman did and what she said, her coolness and her callousness, after witnessing the murder of her child, if not actually committing that murder herself, is all *"in*explicable on any reasonable theory other than that" she was a party to this murder.[3] Evidence of conduct which was obviously the outward manifestation of a guilty secret, has in the scales of justice often been of decisive weight against an accused. In *Com. v. Westwood,* 324 Pa. 289, 301, 188 A. 304, we said of such conduct: "The Commonwealth plausibly argued that the defendant's conduct after the homicide betrayed a guilty conscience. His words and acts were not the normal words and acts of an innocent husband suddenly apprised of the startling fact that his wife had been foully murdered. Rather they bespoke a mind already possessed of a knowledge of the crime, a mind weighted with its guilty secret and already planning an exculpatory alibi."

In the case of *Com. v. Delfino,* 259 Pa. 272, 102 A. 949, the record shows that one of the most important pieces of evidence on which the Commonwealth relied for the

---

[3] The phrase in quotation marks is taken from the opinion of this court in *Com. v. Johnson,* 162 Pa. 63, 68, 29 A. 280, in sustaining a conviction of murder in the first degree on circumstantial evidence no more persuasive than this record contains.

defendant's conviction of murder in the first degree, was the fact that when the defendant, who was standing in a store within thirty minutes after the homicide, committed a half mile away, and *before any one had informed him of the killing,* was told by an officer "come with me," he (the defendant), instead of saying: "What do you want me for," replied, "Search me; I have no gun." He had shot his victim, and a moment later had placed the murder gun on a coal train which he had expected to move quickly to a distant point (but which in fact did not do so). He then made his way to the store where the officer found him. At the trial he protested his innocence but it was persuasively contended by the Commonwealth that the remark he blurted out when confronted by the officer indicated consciousness of guilt on his part. There was also other evidence in the case but this became somewhat equivocal owing to the fact that there were two men in the immediate vicinity of the homicide whose names were "Dominick Delfino." The consciousness of guilt betrayed by the defendant when the officer confronted him, "tipped the scales" against him and he was convicted and executed (confessing his guilt two days before his execution).

Wigmore on Evidence, 2nd ed., Vol. 1, sec. 173, says: "The commission of a crime leaves usually upon the consciousness a moral impression which is characteristic. . . . Its evidential value has never been doubted. . . . There are two processes of inferences involved,— from conduct to consciousness of guilt, and then from consciousness of guilt to the guilty deed." Section 273: ". . . No one doubts that the state of mind which we call 'guilty consciousness' is perhaps the strongest evidence that the person is indeed the guilty doer."

In *Ex parte Jefferies,* 124 Pac. 924, the Criminal Court of Appeals of Oklahoma said in an able opinion: "Law . . . has never required mathematical certainty. . . . The only possible standard of action for the enforcement of law is that we must believe to the same

degree of moral certainty that we act upon in matters of the gravest concern to ourselves, and, when we so believe and act, we meet the full measure of our duty. . . . A trifling circumstance—the fall of an apple—has proved to the satisfaction of philosophers the great laws of gravitation which control the motions of the universe. . . . If we turn from the world without, to the great mechanism within us, we see again that no rational man pauses for one instant to doubt the force of circumstantial testimony." In *Commonwealth v. Twitchell,* 1st Brewster 551, 574, the Court of Common Pleas of the First Judicial District of Pennsylvania, in an opinion by Judge F. Carroll Brewster, quoted with approval the following from Judge Ludlow in *Com. v. Miller,* 4 Phila. Rep. 199 : "Crimes are often committed in secret, and, but for the fact that circumstantial evidence may be produced, would go altogether unpunished. . . . Such are the laws of nature regulating cause and effect that a body of facts may be presented so linked together as to produce a firm belief of the fact to be proven." Judge Brewster then said : "It follows, then, that we cannot close our eyes or lock up our reason in this or in any other case because the evidence is circumstantial." In *Hickory v. U. S.,* 151 U. S. 303, the Supreme Court of the United States, in an opinion by Chief Justice Fuller, dismissed without merit an exception to the instruction of the trial judge that "circumstantial evidence simply means that you take one fact that has been seen, that is produced before you by evidence, and from that fact you reason to a conclusion."

I think what Chief Justice Gibson said in *Com. v. Harman,* 4 Pa. 269, 272, is particularly applicable to this case : "The machinery of criminal justice, like every other production of man, is necessarily imperfect . . . But the law exacts a conviction wherever there is *legal* evidence to show the prisoner's guilt beyond a reasonable doubt; and circumstantial evidence is legal evidence."

I find in this record no grounds whatever for a change of venue and appellant's counsel apparently never found any, as is evidenced by what I called attention to in the first paragraph of this opinion.

It has long been established by decisions of this court[4] that the granting of a change of venue is a matter of discretion with the court below, and there is not a particle of evidence in this record indicating that the refusal of a change of venue was anything but a sound exercise of that discretion. Every juror who was accepted in this case qualified as possessing an "open mind" on the question of the defendant's guilt or innocence and as being able to live up to his or her oath to "well and truly try" the accused, basing a verdict solely on the law and the evidence. As Judge PATTERSON said in his opinion: "At both trials the defendant was satisfied in the selection of the jury without exhausting her peremptory rights of challenge."

If a change of venue is to be granted as a matter of right to every one accused of murder every time newspapers publish before trial highly inflammatory accounts of the crime, with many shocking details, most murderers will be tried away from the county where their crimes have been committed. Such a rule would have sent Guiteau out of the District of Columbia when tried for President Garfield's murder; Czolgosz out of Erie County, N. Y., when tried for President McKinley's murder; James Westwood out of Allegheny County when tried for his wife's murder; Ruth Snyder and Judd Gray out of Nassau County, N. Y., when tried for the murder of Mrs. Snyder's husband; Anna Hahn out of Cincinnati when tried recently for "wholesale poisoning" in that city; and dozens of murderers out

---

[4] *Com. v. Allen* (1890), 135 Pa. 483, 19 A. 957; *Com. v. Cleary* (1892), 148 Pa. 26, 23 A. 1110; *Com. v. Buccieri* (1893), 153 Pa. 535, 26 A. 228; *Com. v. March* (1915), 248 Pa. 434, 94 A. 142; *Com. v. White* (1922), 271 Pa. 584, 115 A. 870; *Com. v. Riggs* (1934), 313 Pa. 457, 169 A. 896.

of New York City for trial in recent years (as, for example, the murderer of Mrs. Tittering), whose crimes were publicized in both pictures and huge headlines and shocking news stories before their trials were held. In *Com. v. Buccieri,* 153 Pa. 535, 546, 26 A. 228, this court, speaking through Justice DEAN, aptly said: "To secure a change of venue [under the Act of 1875], it must be made to appear to the satisfaction of the court [below] that because of 'undue excitement,' or from 'great prejudice' a fair trial cannot be had. The intensity of the excitement and the extent of the prejudice, if either or both exist, are peculiarly within the sound judgment of the court where the crime is committed. . . . Indignation, because of the cruelty of the deed, there doubtless was; it would be strange if such were not the case in a law-abiding community; but there is nothing which convinces us of the existence of such passion or prejudice as would prevent the twelve 'sober, intelligent, and judicious' jurors who were sworn to try the issue from rendering a true verdict on the evidence." In *Com. v. Smith,* 185 Pa. 553, 568, 40 A. 73, this court, in an opinion by Justice MITCHELL denied an application for the "removal of a case," the application being based on allegations that highly inflammatory newspaper accounts had "a prejudicial effect on the prisoner." Chief Justice PAXSON said, speaking for this court in *Com. v. Cleary,* 148 Pa. 26, 23 A. 1110: "It would seriously disturb the administration of the criminal law, if, by merely filing an affidavit, a defendant could have a change of venue as a matter of right."

I am unable to find in this record any adequate basis for the following statement which is contained in the majority opinion, to wit: "The peoples' minds were inflamed when the press carried the horrid details of the crime and particularly so when the conduct of this defendant was related. One might remark, 'any jury in Blair County will send that woman to the electric chair.' That is not the proper spirit for a jury." If there is any

proof that the jurors who tried and convicted Mrs. Karmendi exhibited the *improper* "spirit" for which the majority opinion apparently chides them, it has escaped my painstaking reading of this entire record. To hold that this defendant is entitled *as a matter of right* to a change of venue upon such an unsupported application as was made in this case is to reverse *Com. v. Cleary,* supra, and a long line of similar decisions of this court going back for at least a half century.

I think the fact that out of the 39 prospective jurors called in this case only 11 were disqualified by previously formed fixed opinions and out of 41 talesmen summoned, only 13 were similarly disqualified, or a total of 24 jurors with fixed opinions out of 80 summoned for jury service (i. e., only 30 per cent), proves conclusively that there was no universal or even widespread prejudice in Blair County against this defendant. But the even more important facts are that no one got on the jury with a preconceived fixed opinion as to Mrs. Karmendi's guilt or innocence and no one got on the jury as to whom the defendant or her attorneys *had even the slightest suspicion as to their fairness and openmindedness,* for if defendant or her counsel had had any such suspicion, they would have used the peremptory challenges at all times available to them, the jury box having been filled *before these challenges were exhausted.* Judge PATTERSON in his opinion refusing a new trial said: "Both juries [which respectively found this defendant guilty after two successive trials] consisted of men and women of intelligent judgment and minds free from prejudice." As trial judge he was in a better position than anyone else to know this, and appellant and her counsel only weakly and hesitatingly attempt to controvert his statement.

I would affirm the judgment of the court below. I am convinced that this defendant received a fair and impartial trial and that her guilt was legally established.