Commonwealth *v.* Wentzel, Appellant.

138

Argued May 26, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Wellington H. Rosenberry, Jr.*, with him *Ernest E. Heim*, for appellant.

*Thomas E. Waters*, Assistant District Attorney, with him *E. Arnold Forrest*, District Attorney, for appellee.

OPINION BY MR. JUSTICE DREW, July 7, 1948:

Defendant, Gerald C. Wentzel, was found guilty of murder in the second degree. After his motions in arrest of judgment and for a new trial had been refused and sentence imposed, he took this appeal.

According to the Commonwealth's case, Miriam F. Green, a young woman who lived alone in a first floor apartment in Pottstown, Montgomery County, was found murdered shortly before two o'clock on the afternoon of Monday, December 9, 1946. When her body was discovered by other tenants of the building, she was lying on her left side upon her bed, clothed only in a short polo coat and bobby socks. A kimono had been placed carefully at the back of the body, presumably to keep it from

rolling to the floor. Death was due to strangulation, caused by a woman's blue scarf being folded into a band about one inch wide and tightly tied in a square knot around her neck. There was blood on her face and teeth, as well as on the pillowslip, sheet, spread, coat, socks and scarf. There was also a bloody impression, resembling the shape of a hand, upon the sheet about the center of the bed. Small amounts of blood were also found on the floor of the living room and in the bath tub. All of this blood, upon examination, was found to be of the same type of human blood as that of deceased. Money in the apartment was not disturbed. There was no evidence of a struggle and everything in the apartment appeared to be in order. Her working clothes were neatly folded over a chair in the bedroom. A screen and a metal grating on the outside of the bedroom window had been removed. The front door and the bedroom window were open. Dr. W. L. Franck was called immediately by the police, and, upon his arrival within a few minutes, he examined deceased and pronounced her dead from strangulation. However, because the police officer who had called Dr. Franck to the scene thought that Mrs. Green might still be alive, inasmuch as there was some blood, mucus and air coming from her right nostril, the body was sent to the Homeopathic Hospital in Pottstown. There Dr. Franck again examined the remains and made the same pronouncement. It was this physician's professional opinion (based upon the facts that there was no odor of putrefaction in the bedroom, the amount of air escaping from the lungs and the consistency of the blood and mucus in the nasal fossa when the body was first examined by him) that Mrs. Green had been dead for a period of not much more than twelve hours. Dr. J. S. Simpson, the coroner's physician, performed an autopsy upon the body at seven o'clock that same evening. He found that the neck had been broken and that death was due to strangulation. He concluded

that death had occurred not less than twelve or more than twenty-four hours prior to his examination, predicating his opinion upon the following facts: that there was no putrefaction in the lower right abdomen, the amount of rigidity then in the arms, and the temperature and general condition of the body when he performed the autopsy.

Defendant, a married man residing with his wife and child in nearby Kennilworth, was arrested at a club in Pottstown at about seven-thirty on the evening of the day the body was found. After making many false, conflicting and evasive statements, he finally, when faced with evidence which apparently he thought was insurmountable, admitted the following: He had had an adulterous relationship with Mrs. Green for a period of approximately two years prior to her death, that he had visited her apartment on numerous occasions, that they had drunk heavily at various hotels and taverns, and that he had had intercourse with her as late as December 2, 1946. He had caused her to be pregnant in the Spring of 1946 and an abortion had been committed. Mrs. Green had told him on December 4, 1946, that she had just received her divorce and that she was "going out and flit like a bird" two nights hence when he, defendant, was away on a hunting trip. He admitted that he had a violent temper, and that he had threatened Mrs. Green that if she ever went out with another man, he "would take her and tear her private parts out". He also stated that he had made advances to his wife about a divorce, offering her their home and twenty dollars a week, but that she refused to discuss the matter with him. He admitted he had a quarrel with Mrs. Green about a week before her body was found. He also admitted that he had gone to the Green apartment at eleven o'clock on Sunday night, December 8, 1946, gained entrance with a key which she had given him sometime previously, and, immediately upon turning on the light, discovered her dead body. He claimed, however, that he

had nothing whatever to do with her death, did not touch the body, and that as soon as he made the discovery, he turned out the light and left, shutting the door behind him. He also admitted that when he was in the apartment at that time he did go into the bedroom and he said: "I walked to the side of the bed and stood about the middle of her body. I said, 'Oh, my God', and that is when I put my hand on the bed and that is where the handprint will be about the middle of the body. I then left." He acknowledged his ability to tie various types of knots, including a square one, and admitted teaching others so to do. Also, he stated that shortly after noon of the day the body was found, he had thrown the key to the Green apartment into the Schuylkill River.

The Commonwealth also presented evidence that the scarf with which the murder was committed was lost about midnight, December 6, by its owner, one Joyce Mogel, in the immediate vicinity of the place where defendant admittedly parked his car when he visited the apartment on the night of December 8. In addition, the Commonwealth established that the lights were seen burning in the kitchen and bathroom of the Green apartment and the blinds were drawn at eleven-thirty P. M., December 8; and that defendant's fingernail scrapings, taken shortly after he was apprehended by the police, showed the presence of human blood. Defendant said nothing whatever to the police about his visit to the apartment on the night of December 8 and his discovery there until sometime after his arrest.

Defendant contended that Mrs. Green was not killed on the night of Sunday, December 8, or early the following morning, as contended by the Commonwealth, but rather met her death two days prior to that time, and that he had an alibi from the late afternoon of December 5 until his admitted visit to the Green apartment at eleven o'clock on Sunday night, December 8, when he discovered the dead body of Mrs. Green. In support of his contention, defendant produced evidence that Mrs.

Green was last seen during the early evening of Friday, December 6; that one of the tenants of the upstairs apartment knocked on her door the morning of December 8 and received no reply; that she did not visit her mother in Reading or call her there on December 7 or 8, as was her custom each week-end; and that she did not go to work on December 7. Defendant also offered evidence that he was on a hunting trip some two hundred miles from Pottstown from the late afternoon of December 5 until early the morning of December 8 and he also accounted for his whereabouts thereafter until his admitted visit to the Green apartment on the night of December 8. In view of defendant's many damaging admissions and the other evidence adduced by the Commonwealth, the jury may have concluded, as its verdict would indicate, that over this particular week-end of December 7 and 8, Mrs. Green, who frequently had not been seen by her neighbors for weeks at a time, may have gone away on a visit or may have secluded herself in her own apartment for reasons of her own, and not having a telephone in her apartment, found it inconvenient to call her mother. Defendant called Charles D. R. Kent, the undertaker who received the body on December 9 at about eleven o'clock, P. M., after it had been autopsied and embalmed. This witness, in an attempt to refute the testimony of Doctors Franck and Simpson, called by the Commonwealth, stated that he was of the opinion that Mrs. Green had been dead forty-eight to seventy-two hours from the time when he received the body. In rebuttal, however, the Commonwealth called John S. Frain, the undertaker who witnessed Dr. Simpson's performance of the autopsy and who had embalmed the body, and he stated that it was impossible to determine to any degree of certainty the time of death after a body had been autopsied and embalmed.

Defendant argues that the facts and circumstances presented by the Commonwealth were not of such a character as to produce a moral certainty of his guilt beyond

a reasonable doubt, and, therefore, the learned court below erred in refusing a motion in arrest of judgment. With this contention we cannot agree. Inasmuch as the Commonwealth was unable to produce any eye-witness to the crime and since defendant did not confess to the actual killing, the evidence adduced by the Commonwealth was wholly circumstantial. A careful reading of such evidence reveals that it is more than ample to sustain this conviction of defendant. While none of the facts presented would be conclusive of his guilt when individually considered, yet there is no doubt in our minds that the evidence presented, when considered collectively, required that the case be submitted to the jury.

With reference to circumstantial evidence, we said, in *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A. 2d 95: "The mere fact that the evidence to establish appellant's authorship of the crime is wholly circumstantial is not fatal to the Commonwealth's case. As long ago as Commonwealth v. Harman, 4 Pa. 269, this Court said, speaking through Chief Justice GIBSON (p. 271): 'No witness has been produced who saw the act committed; and hence it is urged for the prisoner, that the evidence is only circumstantial, and consequently entitled to a very inferior degree of credit, if to any credit at all. But that consequence does not necessarily follow. Circumstantial evidence is, in the abstract, nearly, though perhaps not altogether, as strong as positive evidence; in the concrete, it may be infinitely stronger.' See also Commonwealth v. Kovovic, 209 Pa. 465, 468; Commonwealth v. DuBoise, 269 Pa. 169, 174; Commonwealth v. Karmendi, 328 Pa. 321, 333. Nor may we say, as a matter of law, that the guilt of the accused has not been sufficiently established to carry the case to the jury merely because of a remote possibility that the evidence, or some part of it, might be true and the accused still be innocent. The requirement of the law is that in order to warrant a conviction the facts and circumstances proved must be of such character as to produce a moral cer-

tainty of the guilt of the accused beyond any reasonable doubt—not that they need be absolutely incompatible with his innocence—and that doubt is for the jury unless the evidence 'be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances': Commonwealth v. DuBoise, supra, 174. See also Commonwealth v. Karmendi, supra, 334; Commonwealth v. Giovanetti, 341 Pa. 345, 359; Commonwealth v. Marino, 142 Pa. Superior Ct. 327, 333." Furthermore, it is well settled that there is no general rule to determine the quantity of circumstantial evidence necessary to overcome the presumption of innocence and carry the case to the jury; this must be weighed by the trial judge: *Commonwealth v. Karmendi*, 328 Pa. 321, 195 A. 62.

In the instant case, we have evidence of a long-existing illicit relationship between defendant and deceased; that defendant (a powerful young man—then thirty-seven years of age, six foot two inches tall and weighing one hundred ninety-six pounds) had had frequent quarrels with deceased; that he had a violent temper; and that he had threatened her with grievous bodily harm. We also have defendant's own admissions that he was at the scene of the crime at or about the very time when two reputable physicians, called by the Commonwealth, stated that deceased had met her death; and that on the occasion of that very visit he had put his handprint on the bed sheet at the exact spot where the bloody impression, resembling the shape of a hand, was found. J. E. Burke, Federal Bureau of Investigation finger print examiner, testifying for the Commonwealth, stated that upon his examination of this bloody mark, he found it impossible to obtain a "lift" containing sufficient characteristic details to compare it with defendant's hand or palm print because of the porous nature of the bed sheet. If this bloody print was made by the hand of defendant being laid upon the sheet, it is obvious that such print could not have been made unless the blood of deceased

was upon his hand at the time. This would also account for the blood under his finger nails. We also have defendant's admission that he fled from the apartment, knowing that she was dead, and that he thereafter deliberately, to divert suspicion, threw away the key with which he had gained entrance to the apartment, entered into a conspiracy with his wife to say that he first learned of Mrs. Green's death at seven o'clock on the evening of December 9, and evaded revealing to the police, until after his arrest, the facts as to his visit to the Green apartment on the night of December 8 and of his discovery there. The jury could reasonably infer from the fact that the apartment was in order when the body was found and that it showed no evidence of a struggle that deceased was alive and expecting defendant when he arrived at her apartment on Sunday night, December 8, and also that after committing the killing, he sought to avoid suspicion by removing the screen and grating and opening the door and bedroom window.

One of the most significant indications of defendant's guilt is to be found in the numerous false, evasive and contradictory statements which he made to the District Attorney and to the police following his arrest. In these statements, defendant first denied and then gradually in later statements, admitted, among other things, more and more as to his presence and actions during his visit to the Green apartment on Sunday night. Less than an hour after his arrest, defendant made his first statement, wherein he freely admitted his meretricious relationship with Mrs. Green; said that he feared his wife was becoming aware of such association; denied that he went to the Green apartment on December 8; stated that he left a club in Pottstown and went directly home that night, arriving there at eleven-fifteen; denied that he had a key to the apartment of Mrs. Green; stated that she was never pregnant to his knowledge; and said that he did not know of her death until told by a service station owner about a half hour before his arrest on Monday

evening, December 9. Some twenty-six hours later, while still in custody, defendant made a second statement, in which he admitted that he did not go directly home from the club on the night of December 8, but rather went to the apartment of Mrs. Green; that the door jarred open as he was about to knock; that he went in, turned on the light, saw the dead body of Mrs. Green and ran out without going into the bedroom; and that he told his wife the following day about this visit and what he found. He made a third statement about twenty-five minutes later, in which he reiterated visiting the apartment of Mrs. Green on the night of December 8, stated that he was only there ten seconds, and that he did not go into the bedroom or bath but only went to the bedroom door. In this statement, he also stated that he had had a key to the apartment but had returned it to Mrs. Green two or three weeks before. Here, for the first time, he said that he did not touch the body, and he also said that he and his wife had no agreement between them as to the story they were to tell to the police with reference to this murder. Forty-five minutes later, defendant gave his fourth statement, wherein he admitted that he did have a key and had used it to gain admission to the apartment on the night of December 8, and that he had thrown it into the Schuylkill River at about noon when he, his wife and sister-in-law were crossing the bridge about one o'clock on the afternoon of December 9. The next morning, December 11, at about eleven o'clock, in the office of the District Attorney, defendant gave his fifth statement, wherein he stated that he had been drinking at a club in Pottstown on December 8 from seven to eleven o'clock, P. M., that he was then pretty hazy, and that when he entered the Green apartment that night, he did go into the bedroom and put his hand on the bed, leaving a handprint. In his sixth statement, made that same morning about forty-five minutes later, defendant reiterated what he had said in his fifth statement, and also admitted putting his hand on the bed at about the

middle thereof and he actually diagrammed his position beside the body, and where his hand was placed. In his seventh statement, made on January 6, 1947, defendant first denied the pregnancy of Mrs. Green, and then admitted it and also stated that they had discussed abortion and even suicide. He also admitted that he and Mrs. Green had arguments, that he had lots of girls, that he had a bad temper and that he had struck girls across the neck while playing tennis. In this statement, defendant admitted also that he and his wife, whom defendant had informed at noon on December 9 of his visit to the Green apartment the previous night, had agreed to say seven o'clock the night of December 9 was the first time they knew of the murder; that he had asked his wife for a divorce and that she had refused to listen to him, although he had agreed to give her his house and twenty dollars a week. Defendant made his eighth statement shortly after making his seventh, and it is largely repetitious.

In support of his contention that his motion in arrest of judgment should have been granted, defendant leans heavily upon *Commonwealth v. New*, 354 Pa. 188, 47 A. 2d 450, where this Court reversed a judgment of the court below after a conviction of murder in the first degree and ordered defendant's release. That case readily can be distinguished from the instant one. There, the factual situation was entirely different from that here. In that case we were unanimously agreed that defendant's conviction was based on evidence so weak and inconclusive that as a matter of law no probability of fact could possibly be drawn from the combined circumstances. Here, however, the very reverse of that is true. This defendant was convicted of murder in the second degree on evidence which, though wholly circumstantial, leaves no reasonable doubt in our minds as to his guilt. To hold that the evidence here presented did not warrant the submission of this case to the jury would be almost tantamount to a complete elimination of convictions

based entirely upon circumstantial evidence, however strong and conclusive.

Defendant also argues that the court below erred in refusing to grant his motion for a new trial. He assigns as error, inter alia, the admission in evidence, over the objection of his counsel, of the following: certain photographs taken of the scene of the crime as reconstructed by the police some time subsequent to the killing; photographs of the body of the deceased; the statement of defendant made on January 6, 1947; and of testimony that deceased was pregnant by defendant in the early part of 1946. We find no merit in such argument.

As to the photographs of the scene of the crime, as reconstructed, Officer Hahn, who was the first policeman to arrive at the Green apartment shortly after the crime's detection, testified that the condition of the bedroom when photographed was the same as it was when he entered it for the first time on December 9. Furthermore, these photographs were proved and identified by the photographer who took them. We agree with the learned court below that: "While the weight of the testimony might be affected by the fact that the foundation had to be laid by Officer Hahn, yet in view of his explanation to the jury we feel that they were competent evidence." Under the circumstances, we do not believe the trial court abused its discretion in admitting these pictures.

The photographs of the deceased were taken at a funeral parlor shortly after the body was found, and their correctness is not questioned. They were offered better to enable the jurors to understand the appearance of the body when found, the clothing then upon it, and the position of the scarf used in the killing. These photographs were referred to by Dr. Simpson and other witnesses for the Commonwealth to explain and corroborate their testimony. It is conceded they were not pleasant to look at. At the time they were received in evidence, the learned trial court instructed the jury as follows:

"However horrible a crime may have taken place, as shown by these pictures, does not indicate the guilt of this defendant. You will have no prejudice against any one because of these photographs or anything like that. It may be they are to some extent shocking. Of course, after all, you are passing upon the guilt or innocence of this defendant. They are only put into evidence for such aid as they may be to you in determining the issue which comes before you for determination." As to the admission of similar photographs, we said, in *Commonwealth v. Ferry*, 326 Pa. 129, 133, 191 A. 130: "Such photographs are admissible in evidence. . . . However, the admission or exclusion of such exhibits is a matter within the sound discretion of the trial judge. If he believes that their effect may be to inflame the jury's emotions against a defendant and their admission is not necessary to show the location of wounds, they should be excluded. Whenever they are received in evidence, the jury should be instructed as to their purpose and cautioned not to permit the photographs to stir up their emotions to a defendant's prejudice." See also *Commonwealth v. Dreamer*, 324 Pa. 220, 188 A. 117; *Commonwealth v. Earnest*, 342 Pa. 544, 21 A. 2d 38. The trial court exercised due caution in admitting these photographs. They were an important part of the Commonwealth's case and it was proper to admit them with the cautionary statement of the court.

With reference to the admission of defendant's statement, made in question and answer form, on January 6, 1947, while in the custody of the District Attorney, defendant contends that it was reversible error to have admitted the statement, because some of the questions propounded to him contained self-serving and argumentative declarations. Defendant does not deny that he was afforded every opportunity to make full answer, or that the statement was an accurate transcript of the conversation that took place between him and the District Attorney. There is no claim of coercion or that the an-

swers given by defendant were not offered voluntarily. There was no abuse of discretion in admitting the evidence. "Voluntary statements made by a defendant as to the occurrence may be used against him although not containing a confession of guilt": *Commonwealth v. Tenbroeck*, 265 Pa. 251, 254, 108 A. 635.

It is clear that evidence of the pregnancy of Mrs. Green was admissible. This testimony proved the intimate relationship which existed between the parties and was a material fact to be considered by the jury. It was the Commonwealth's contention that this relationship led to the killing. We said, in *Turner v. Commonwealth*, 86 Pa. 54, 70: "That adulterous intercourse may be proved as a circumstance leading to the commission of crime, is ruled in the case of Ferrigan v. Commonwealth, 8 Wright 386, and it would thus seem to follow that if the criminal conduct proposed to be proved becomes in any way a link in the chain of circumstances which connects the defendant with the crime charged, it is admissible in evidence. That such circumstance is in its character criminal, and tends to exhibit another crime than the one charged, is no reason for its exclusion."

We have carefully considered all the assignments of error and find them without merit. The record shows that defendant received a fair and impartial trial, that the charge of the court was comprehensive and free from error, and that the evidence adduced was more than sufficient to sustain this conviction of murder in the second degree. Under such circumstances, the sentence must be sustained.

Judgment affirmed, and record remitted to the court below to the end that the sentence may be carried into effect.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE MAXEY:

A careful study of this record convinces me that the Commonwealth produced no evidence which justified a verdict of guilty of murder against this appellant and

the trial judge should have given binding instructions for acquittal. He could have well said as other judges have said under like circumstances, "No man can be *guessed* guilty in *this* court".

If the evidence in this case does not prove the defendant's innocence "beyond a reasonable doubt", it certainly greatly *preponderates* in his favor. Wentzel found himself enmeshed in a set of circumstances which raised a *suspicion* of his guilt, but each of these circumstances is consistent with his innocence. There is no rule in law or in logic that *several* suspicious circumstances, *each one of which* is consistent with the innocence of an accused, becomes proof of guilt when they are *considered together*. Four or five times *nothing* is *still nothing*. In this case it is impossible to find a single fact cited against the accused which is not consistent with his innocence. The fact that Wentzel was in this woman's room a few minutes after 11:00 P. M., Sunday, December 8, 1946, and found her dead and did not report that fact to the police was just as consistent with the theory that he did not wish to have his affair with this woman made known in the locality in which he lived as it is with the theory that he was her murderer. All the evidence indicates (as we will point out) that this woman had been murdered *forty-eight hours before Wentzel found her dead*. If a man came home and found his *wife* murdered, he would naturally report it immediately to the authorities, but if he went to the apartment of a woman with whom he had maintained adulterous relations for two years and found *her* murdered, he might hesitate to report it to the authorities lest the question would be propounded to him, "What were *you* doing in her apartment at 11:00 o'clock at night?" Wentzel probably calculated that Mrs. Green's neighbors would find her murdered and report that fact (as they did do on the next day), and as he himself said, he expected that the murderer would soon be apprehended and that he would not become involved in the case in any way.

That this married man carried on a liaison for two years with Mrs. Green is admitted, but Wentzel was not tried for adultery, and besides there is a wide difference between adultery and murder. His false statements after his arrest are easily accounted for by his anxiety, first, to cover up the duration and intensity of the intimacy between himself and Mrs. Green, and, second, to protect himself (as he ignorantly calculated) against the suspicions which surrounded him when he admitted that he had been in Mrs. Green's apartment for a few minutes on December 8, 1946, an admission which presumably he would *not* have made had he been the murderer because no one had seen him enter *or* leave her apartment. He knew he was suspected of having killed this woman, and under those circumstances the average man of Wentzel's age is quite likely to be in a stage of mental panic and not use good judgment. Wentzel made a serious error of judgment when he did not report Mrs. Green's death immediately after he discovered her dead in bed at 11:00 P. M. Sunday night. But, as Chief Justice SHAW said in *Commonwealth v. Webster*, 5 Cush. 295, 316: "an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs." We approvingly quoted this statement of Chief Justice SHAW in the *Commonwealth v. New* (1946) case. (post)

It is an established principle that no jury shall be permitted to convict a man on *suspicion*. Suspicion is no substitute for proof. This time-honored principle that no jury shall be permitted to convict on suspicion was invoked and restated by Mr. Justice DREW in the case of *Commonwealth v. Bausewine*, 354 Pa. 35, 46 A. 2d 491. In that case, the defendant, Bausewine, Chief of Police of the Borough of Norristown, had been convicted of bribery in the Court of Quarter Sessions of Montgomery County. His conviction had been affirmed by the Superior Court, but this Court allowed an

appeal, and after hearing the arguments we unanimously reversed Bausewine's conviction and ordered him discharged. In that case this Court, speaking through Mr. Justice DREW, said: "it must be remembered that guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony. The facts and circumstances proved must, in order to warrant a conviction, be such as to establish the guilt of the defendant, not necessarily beyond a moral certainty, nor as being absolutely incompatible with his innocence, but at least beyond a reasonable doubt". In that case the proof of guilt of the defendant was far stronger than any evidence adduced against Wentzel in this case.

In the case of *Commonwealth v. New,* 354 Pa. 188, 47 A. 2d 450, this Court reversed the conviction of the defendant who had been found guilty of first degree murder and sentenced to life imprisonment. The evidence against that defendant, like the evidence against Wentzel in this case, was wholly circumstantial. The court below in *that* case cited 52 facts which it believed indicated when considered as whole, the guilt of the accused. We showed in our opinion that none of these facts supported exclusively the theory of guilt and we ordered the prisoner's immediate discharge. In that case we quoted what Justice STRONG said in *Benford v. Sanner,* 40 Pa. 9, 17, and what Mr. Justice LINN reiterated in *Rosenblum v. Rosenblum et al.,* 320 Pa. 103, 181 A. 583, at 198, to wit: "Mere suspicion, possibility of guilty connection, is not to be received as proof in such a case, . . ."

In *Commonwealth v. New,* supra, we pointed out how easy it is to convict innocent persons by drawing inferences of guilt from suspicious circumstances. We said, "In the annals of crime there are many instances of persons 'last seen' with the victim of a murder being suspected of the crime though later another's sole guilt

of that crime was established." In the instant case we have no proof that Wentzel was the person last seen with the victim before her death because the evidence clearly indicates that she was killed not on Sunday night but on the preceding Friday night. In the *Commonwealth v. New* case we cited copiously from Wigmore's "Principles of Judicial Proof". In that work Wigmore quotes from Burrill's "A Treatise on Circumstantial Evidence". We said: "Burrill points out the infirmity of proof based upon an inference of guilt of an accused merely from the fact that he was in the vicinity of a crime at the time when it may have been committed." Burrill points out that even though it is proved that a man may have had the "opportunity to commit a crime . . . It does not necessarily follow that it was actually taken advantage of by the party shown to have possessed it; or that it was not taken advantage of by another person. . . . The real murderer may have left the dead body, and escaped from the room or the house in which it is found, only the moment before the accused entered it."

In footnote 3 of our opinion in the *Commonwealth v. New* case we quoted Wigmore's report of the well-known case of Jonathan Bradford, an innkeeper, who upon hearing groans from one of the rooms snatched a knife to defend himself and entered the room to investigate, where he found one of the guests "weltering in his blood in the bed." Others came to the room and found Bradford "terror stricken." He was arrested for the murder, tried and hanged. Sometime afterwards it was established that the murder was committed by another guest who, upon stabbing the victim escaped from the room two seconds before Bradford entered it. We also cited the case of William Habron, reported by Lord BIRKENHEAD in Vol. 2, p. 21 of "Famous Trials of History". Defendant who had been on the scene of the murder of a policeman and who had made threats against the officer, and whose "muddy boots" fitted the tracks in the

mud at the scene of the crime, was convicted and sentenced to death for killing the officer. The sentence was later commuted to life imprisonment. Some time afterwards a professional burglar confessed that as he was attempting to commit burglary in that vicinity, he was accosted by the officer and that he shot him and fled. In footnote 6 we cited the case of *People v. Holtz*, 294 Ill. 143, 128 N. E. 341, where a woman and her aunt were prosecuted for the murder of the wife's husband and the wounding of the aunt's husband. Both were shot at 4:00 A. M. in the house where both couples resided. Both women were convicted and sentenced to imprisonment. The defense was that the evidence did not exclude the possibility of an intruder in the house. The Supreme Court of Illinois reversed the conviction, saying "opportunity, alone, is not sufficient to justify a conviction even though they [defendants] are unable to show who did commit it. The burden still rests upon the prosecution to show, beyond a reasonable doubt, that the crime was actually committed by them and not by some other person."

We also said in *Commonwealth v. New*, supra: "When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty. When a party on whom rests the burden of proof in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither."

All the evidence against Wentzel is entirely consistent with the theory that some prowler entered the window of the first-floor apartment of Mrs. Green on Friday night, December 6, 1946, and killed her.[1] When

---

[1] Since this case was argued before the Supreme Court late last May the Philadelphia newspapers have reported murders by prowlers. The *Inquirer* of June 10, 1948, stated "that Mrs. Katherine Mellor, 47,

her body was found at two p. m., Monday, December 9th, the screen on the outside grating on her bedroom window had been removed. There was no reason why Wentzel should have removed this because he had access to Mrs. Green's apartment by a key. That nothing was stolen from Mrs. Green does not negative the theory that her death was caused by a prowler. The intruder may have lost his nerve and got out before he took anything, or he may be one of those too numerous sadistic creatures who kill for the mere lust of killing.

Mrs. Evelyn Eckenroth testified that her sister, Miriam Green, had told her that there had been an intruder in her (Miriam's) apartment some time in November, 1946. The defendant also testified that Miriam Green had reported in November that there had been an intruder in her apartment. He also testified that in the middle of November, 1946, when he and Miriam came to her apartment and Miriam went to the bathroom they "found foot prints at the bath tub . . . a smear from the dust on the window along side the tub, and the foot prints were in the bath tub." He said he then "locked every window in the house except the bedroom" window.

was murdered by a prowler in her apartment at 1227 W. Girard Ave. on Monday afternoon . . . her semi-nude body was lying in a blood-stained bed when her husband returned from his work . . . at 6:30 P. M.". The *Inquirer* of the same date reported the arrest of a forty-six-year-old man "on a charge of attacking a woman in an automobile in a public garage Monday night". The *New York Tribune* of April 10th reported the confession of one Julio Perez, an ex-convict, who had garroted a woman at 144 East 55th Street on March 30th. He obtained entrance to that woman's apartment by using a screw driver and penknife, and when Mrs. Lolito discovered him and screamed, he fatally stabbed her with the screw driver. A few years ago there was executed in Winnipeg, Canada, a man who confessed to killing eighteen women in the United States and Canada who came to the back doors of their homes in answer to the killer's knock on the door. His motive was not robbery; he killed just to satisfy his lust to kill, just as some prowlers prowl for the satisfaction of prowling. A little girl was killed in the same County in which Mrs. Green was killed about two years ago and the murderer has not yet been apprehended.

There was some difficulty about locking that. He said the time was in the middle of November on a Wednesday night. He also said there was nothing missing from the apartment.

The majority opinion refers to the fact that fingernail scrapings taken from Wentzel after he was apprehended by police show the presence of human blood. This proves nothing. There is not a shred of evidence that this human blood was Mrs. Green's. Wentzel testified that for eight years he had been afflicted with dermatitis, which is an inflammation of the skin, and his physician, Dr. K. E. Van Buskirk, testified that Wentzel was suffering from "dermatitis on the back of both hands, and also of the left lower leg above the ankle." He said, "On the palms—on the backs of the hands there were raised, red, elevated areas, some of them fissured and cracked and some perfectly clean." He was asked, "Was or was not blood present as an accompanying factor?" The doctor said, "Blood was present at the time when I first saw him on the leg." He examined Wentzel on the third of December, 1946, and he then had several lesions which were cracked open and *bleeding*. He said that the defendant could *not* have been free of this condition on December 9th, 10th or 11th. It is obvious then from Dr. Van Buskirk's testimony that the defendant might have got blood under his fingernails by scratching himself. There is not a particle of evidence in this case that the blood found under his fingernails was the blood of Miriam Green. Therefore, all evidence of blood under his fingernails should pass out of this case. It had no probative value whatever, and the jury should not have been allowed to consider it.

The evidence which tends to prove this defendant innocent of the killing of Miriam Green is as follows: First, Mrs. Katie O'Meare, the mother of Miriam Green testified that her daughter "Miriam [who was not living with her husband] has always spent her Saturday

nights at my home [six miles from Reading]. She came there early sometimes and sometimes it was late, and she spent her whole Sunday there, and on Sunday night she would return to Pottstown." When asked "How would she go back?" she answered, "Whenever I saw her go back she went back by train." Questioned about any week-end she did *not* spend there, her mother answered: "There were very few, and if she did not spend the weekends at our place, *she called us on the telephone* . . . between three o'clock and five o'clock Saturday afternoon." Question: "Coming down to Saturday, December 7th, last year, I ask you whether or not on that Saturday you had a telephone call from Miriam?" Answer: "No, we did not." Question: "And neither did she come to your home that weekend?" Answer: "No." Question: "Was that the *first* occasion on which you did not receive a call or she did not come home?" Answer: "Yes, it was. If she did not call me on a Saturday, she would call us on Sunday morning and tell us why she did not come, or if she was not coming at all." Question: *"On this weekend you received no call?"* Answer: "No." Question: "When had you last seen Miriam?" Answer: "The Sunday before [her death]." Question: "As a result of seeing her do you know whether or not she *intended* to come home the following Sunday?" Answer: "Yes, that was the last she said to me, *'mother I will see you next weekend.'* " (Italics supplied)

This is testimony of great probative value in indicating that Mrs. Green was dead on Saturday, December 7th. Any individual who *is in the habit* of spending weekends with their mother invariably notify their mother if something prevents their going home. Mrs. Green had no telephone in her apartment, but it is conceded that there was a telephone in the apartment above her and that she had the use of this telephone. There is absolutely no reason why Mrs. Green did not use the telephone upstairs to notify her mother that she was not going home, as she had promised to do, unless Mrs. Green

was dead on Saturday, and if Mrs. Green was dead on Saturday, Wentzel was not her killer as he was then in Potter County. The Commonwealth concedes that if Mrs. Green was killed before Sunday evening Wentzel was not the person who killed her.

Further proof that Mrs. Green was dead on Sunday is the testimony of Evelyn Eckenroth, Mrs. Green's sister, that Miriam had been in the habit of coming home weekends. She said: "She usually called me between two thirty and five o'clock on a Saturday afternoon and told me where to meet her. Sometimes she would come on an early train and sometimes not until eight thirty, then we would go out together." Question: "Did she come to your home every weekend?" Answer: "Every weekend or she would call." Question: "Coming to Saturday, December 7th, did you get a call that weekend?" Answer: "No, I went to town early to do some shopping and I called my mother at six thirty to see whether Miriam called. She had not called and I called back again at nine o'clock to see whether she had called and still she had not." Question: "Is that the first weekend she had not called or come home?" Answer: "Yes." She then testified about the intruder being in Miriam's apartment as before narrated.

Another fact that offers strong proof that Miriam Green was dead long before Wentzel called at her apartment on Sunday night was found in the evidence of Mrs. Green's neighbor, Mrs. Ruth Hoffman of 358 Chestnut Street, Pottstown. Mrs. Hoffman occupied the apartment over that occupied by Miriam Green, and she testified the victim was last seen by her at six P. M. on Friday, December 6th. That was at least forty-eight hours before Wentzel entered her apartment. She heard no unusual noise in Mrs. Green's apartment on Sunday night, though she heard the door slam about eleven P. M., but that was not unusual because the door was hard to close. She was asked about whether conditions in her apartment on Sunday night, December 8th. She said: "I

believe it was quite cold. It was until 5 o'clock in the afternoon." She said then it got hot either sometime during Sunday night or early Monday morning. On Monday, December 9th she noticed the front door of Mrs. Green's apartment being open, and her bedroom window also was up. She found Mrs. Green's body on the bed. She then called the landlord and then the police was summoned. "It was so cold," she said, "and uncomfortable on Sunday afternoon, December eighth," that they tried to get in touch with the landlord to see what the trouble was. The apartment was heated by an oil burner and controlled by the thermostat and the thermostat was in Mrs. Green's living room.

Mary Jane Seyler testified she lived on the second floor apartment over Mrs. Green, and on Sunday, December eighth the apartment was "very cold."

R. Earl Seyler, the husband of Mary Jane Seyler, testified about the apartment being cold. He said he was anxious to enter Mrs. Green's apartment to change the thermostat, and he went down and knocked on Mrs. Green's door but didn't get any answer. He was then asked: "Was the door closed?" Answer: "Yes." Question: "About what time was this?" Answer: "Around noon." He said he knocked a couple times, then went upstairs to get the key. He said: "I was going to unlock the door and push the thermostat up, because she said, 'If you need any heat, just come down and leave me know.'" The key would not open the door. Then in order to get heat they went ". . . down the cellar. We found out the circulator switch had been turned off accidentally." When this situation was remedied they got heat.

It is incredible that if Mrs. Green was alive in her apartment on Sunday, December eighth, she would not have answered the door when her neighbor knocked on the door, and it is equally impossible to believe that she would not have complained of the cold in the apartment, for according to the testimony of the physician who

made the autopsy she was in a physical condition where she would have required heat.

One other fact that tends to prove that Mrs. Green was killed on Friday night was the fact that no human being saw her alive after six p. m., Friday night. Unless an individual immures himself or herself in a bedroom away from all human beings, it is almost impossible that some person would not see that individual. If Mrs. Green was out of her apartment after Friday night somebody would have seen her and would have reported that fact when a few days later her murderer was publicized. On the other hand, if she was in her apartment on Sunday during the extreme cold weather she would have turned on the heat and would have responded when her upstairs neighbor knocked on her door.

Another fact that tends to prove Wentzel innocent of this crime is the condition of the body when discovered on Monday afternoon. Mrs. Green was discovered at two p. m., Monday, December ninth. The Commonwealth claims that Wentzel killed her at eleven p. m. the night before, Sunday night. If that was the fact, she would have been dead only fifteen hours when the body was discovered. The testimony which the Commonwealth produced to prove the condition of the body when discovered is most unsatisfactory. The officials should have called in an experienced undertaker who could have determined with a fair degree of accuracy how long the body was dead when it was discovered at two p. m. Instead of that, reliance is placed upon the testimony of Dr. W. L. Franck, who was clearly an incompetent witness. He had no experience in examining corpses to determine how long they had been dead. He did not even examine Mrs. Green's body to determine how long she had been dead. He said he "didn't examine her except to notice she had bobby socks on. The body was then taken to the Homeopathic Hospital. He added: "I don't think it had been dead much more than twelve hours." He admitted that he had had no pathological

work on corpses. When he was asked by the District Attorney as to whether or not putrefaction had set in, he said: "I didn't examine the body." He also said the only thing he was interested in was to determine whether Mrs. Green was alive or dead. It was shown that Dr. Franck's first report was that Mrs. Green had been dead only three hours. This was, of course, an absolute absurdity.

Dr. John C. Simpson, the coroner's physician, when asked an opinion as to the length of time Mrs. Green had been dead when he saw her on Monday evening said: "That putrefaction was in the upper part of the chest and neck." He said that he felt that death had occurred "between twelve and twenty-four hours at the time he saw the body at 7 p. m., Monday night. On cross-examination he was asked this question: "Is it possible that this body was a corpse for forty-eight hours?" Answer: "It is possible." Question: "It could have been a corpse for seventy-two hours?" Answer: "It could." It is conceded that the Commonwealth's case stands or falls upon the evidence as to the time of Mrs. Green's murder. If she was not killed Sunday night Wentzel did not kill her. To convict this defendant the Commonwealth had to *prove* that Mrs. Green had been dead longer than twenty hours before Dr. Simpson performed the autopsy at 7 p. m., December ninth. But Dr. Simpson said the body *could* have been dead forty-eight to seventy-two hours before that time. Such being the testimony, how could any court permit a jury to guess from Dr. Simpson's evidence that Mrs. Green on Monday night had been dead *only* twenty hours?

The witness who apparently knew most about the condition of the corpse was the undertaker, Charles D. R. Kent, who had been a licensed funeral director for twenty-one years. He testified that he had handled about five thousand dead bodies; that he was President of the Pennsylvania Undertaker Association; that he received Mrs. Green's body in his funeral home December

ninth, about 11 o'clock in the night; that he examined the body; and that to qualify himself he had taken courses in biology, embalming, and chemistry. He described Mrs. Green and he said: "the face was almost twice the size. The arms and shoulders were very much enlarged, which, of course, was caused by tissue gas and tissue gases of course caused by putrefaction which of course would be gas developing between the skin which would cause the swelling which is an indication the body had been lifeless for some time. It was swollen to the point it could not be reduced, so that we could make the body visible to show for the family and friends and relatives. Which is very unusual to have something like that occur when bodies are found within a reasonable length of time." He said there were putrefaction blisters on the chest and neck," though the body had been embalmed. He said it was his opinion that the body had been dead from forty-eight to seventy-two hours. He based this on his "experience and marks of decay which could not exist in a short time like this." He was asked: "Is there no history of any case where the body had been dead less than that, and the body decayed in a similar manner?" He answered: "Not in my experience."

To my mind the testimony completely negates the testimony of Dr. Franck who only examined the body for a few minutes. Dr. Simpson did not contradict the testimony of Undertaker Kent. Dr. Simpson admits the body *could have been dead forty-eight to seventy-two hours.*

The Commonwealth attempted to contradict Mr. Kent by calling a mortician by the name of Herbert Houck, who was asked this question: ". . . could you, an undertaker, after those things had occurred (autopsy and embalming), state how long that body had been dead?" He answered: "I don't think an undertaker can actually state it if he had not seen the body before it was embalmed." It was developed that Mr. Houck had only been a licensed undertaker one year.

John S. Frain was also called to contradict Mr. Kent's testimony. He testified he was a licensed embalmer. He was asked: "In your opinion, after the autopsy had been performed on the body in such a manner as this body, as the autopsy had been performed on this body, and after it had been embalmed, can an undertaker state how long a body had been dead?" He answered: "Well, he could guess to a certain extent. I mean he would know the conditions of the body before." He was asked if he embalmed the body and he said, "Yes." It is a very significant fact that even though the District Attorney called Frain, the embalmer, as a witness, he did not ask him how long the body had been dead. It was clearly his duty to do this. The inference is a reasonable one that if Frain's answer had been favorable to the Commonwealth's contention the question would have been asked.

Another fact in support of the theory that Mrs. Green was murdered on Friday night was the testimony of Pauline J. Sapira, a personal friend of Mrs. Green. She testified she had been with Mrs. Green on Saturday, November 30; that arrangements had been made for the two women to meet on Saturday night, December 7th. She said, "Miriam was supposed to call home . . . and later I would either call Evelyn or she would call me, and let me know what the arrangements were." Mrs. Sapira's home and Mrs. Green's mother's home were in the same general locality. She was asked, "Did you hear from or see Miriam Green the weekend of December 7th?" She answered, "No." The only reasonable explanation of Mrs. Green's failure to notify her mother and her friend Mrs. Sapira that she could not keep the weekend engagement with both of them was that she was then dead.

Still another set of circumstances which weighs heavily in Wentzel's favor are these: The autopsy revealed that when Mrs. Green was murdered she was having her menstrual period. Since that is the fact, if she had been alive in her apartment on Sunday, Decem-

ber 8th, she would have demanded heat in the apartment. It has been shown that the apartment above Mrs. Green was so cold on that date that its occupants vainly endeavored to get into Mrs. Green's apartment where the thermostat regulating the heat in both apartments was located. Their knocking on her door brought no response. The reasonable inference is that Mrs. Green was dead at that time. She had been last seen alive in her apartment at about 6:00 P. M., Friday, December 6th. If she had gone away from her apartment on Saturday and Sunday someone would have reported having seen her. There was no such report. She did not go, as she had planned to do, to her mother's home near Reading and did not telephone her mother, as was her custom and promise when she could not go home for the weekend.

It is also proved that in this case Mrs. Green's monthly period began on Tuesday, December 3rd. Her mother testified that it usually lasted three or four days. That length of time would have extended until Friday night. That was the night when it was obvious that she was murdered, as the autopsy showed she was having her period when she was murdered. When she was murdered on Friday night Wentzel was 150 miles away from her. He was in Potter County.

Another fact in favor of Wentzel's innocence is the fact that when he was at the Elks Club on Sunday evening, December 8th, bowling he told Eddie Hartenstine before he left there he was going to see Miriam Green that evening. If Wentzel had planned to kill Mrs. Green that evening he certainly would not tell anyone that he was going to her apartment. If he killed Mrs. Green as a result of a sudden quarrel that evening it is likely that the tenant on the next floor would have heard it. They were awake and saw a light in Mrs. Green's apartment at 11:00 P. M. but heard no noise except that of a door slamming. If a prowler killed Mrs. Green on the preceding Friday night by entering the open window of

her bedroom he may have choked her to death before she had a chance to make an outcry. Besides, the tenant on the floor above Mrs. Green's apartment may have been sleeping when the prowler entered Mrs. Green's apartment on Friday night.

Another fact that supports the theory that Mrs. Green was killed Friday night is the fact that the black and white checked skirt and the green sweater which she had worn to work on Friday was found on Monday "folded neatly over the back of a chair in the bedroom." The bobby socks which she wore to work on Friday were also found on her dead body. It is a reasonable inference that if Mrs. Green was alive on Sunday night she would not be wearing the same skirt and sweater and bobby socks that she had worn to work on Friday. The clothes which she wore on Friday were presumably the last clothes she ever wore before her death. That night before she retired she folded them neatly where they were found on the following Monday.

The following nine facts are utterly inconsistent with the theory of the Commonwealth that Mrs. Green was murdered Sunday night, December 8th. They are consistent with the fact that Mrs. Green was murdered on Friday night, December 6th, when Wentzel was 150 miles away in Potter County.

1. No one saw Mrs. Green alive after 6:00 P. M. on Friday, December 6th.

2. Mrs. Green had promised to spend the weekend with her mother, near Reading, or to telephone her. She did neither.

3. Mrs. Green had promised to meet her friend, Mrs. Sapira, during her weekend visit with her mother or to let her know. She did neither.

4. The clothes and stockings which Mrs. Green had been wearing just before she was killed were the clothes and stockings she wore on Friday to work.

5. Though on the preceding Tuesday she sent her employer word that she could not come to work "because

of sickness" when she did not come to work on Saturday she made no report to her employer.

6. Though it was very cold in her apartment on Sunday and though the neighbors on the floor above were knocking on Mrs. Green's door so that the thermostat in her apartment might be adjusted for more heat, Mrs. Green did not respond to the knocking.

7. If Mrs. Green had been alive on Sunday she would certainly have had heat in her apartment, both for her comfort and for her health.

8. The fact that her body, though it was embalmed 24 hours after 11:00 P. M. Sunday night, was in such a condition that it could not be viewed by her friends and relatives showed that she must have been dead *more than 24 hours before* the embalming took place. It is not unusual for bodies to be dead 24 hours before discovery or to be embalmed 24 hours after death, *but it is most unusual for a body embalmed 24 hours after death to be in such a state that it cannot be viewed by friends and relatives.* The Coroner's physician, Dr. Simpson, said Mrs. Green's body "could have been a corpse 72 hours" before Monday evening. C. D. R. Kent, an undertaker of experience and professional training, said that on the evening of December 9th that Mrs. Green had been dead from 48 to 72 hours. He added that he based his opinion upon "experience and marks of decay which could not exist in a short time like this." (By "short time" he apparently meant the 20 to 24 hours the Commonwealth claimed the body had been a corpse before Monday evening.) Dr. Franck upon which testimony the Commonwealth relies to prove the basic issue in this case, that issue being the time when Mrs. Green was killed, admitted that he did not examine the body except to determine whether it was alive or dead, and it is testified to in this case by William J. Rushong, Coroner of Montgomery County, that when Dr. Franck called the Coroner to report the case he told the Coroner that Mrs. Green had been dead "only 3 or 4 hours." By that state-

ment Dr. Franck showed that his inconsistent testimony as to the length of time Mrs. Green was dead was worthless. How, in the light of the testimony of Dr. Simpson and Undertaker Kent, can any one contend that it was proved beyond a reasonable doubt that on Monday evening, December 9, 1946, Mrs. Green had been dead only 20 or 24 hours and not dead 48 or 72 hours?

9. The autopsy showed that Mrs. Green was killed during her monthly period. It was testified that this began on December 3rd and usually lasted 3 or 4 days. Since Mrs. Green was seen alive at 6:00 P. M., Friday, December 6th, she must have been killed on that Friday night.

To prove Wentzel guilty of this crime it was incumbent upon the Commonwealth to prove beyond a reasonable doubt that Mrs. Green was murdered on Sunday evening, December 8th, and that she was alive on December 6th and December 7th. Certainly the evidence is preponderantly in support of the proposition that she was killed on Friday, December 6th, and that that is why she did not visit her mother and her friend, Mrs. Sapira, on Saturday night, December 7th, and did not telephone them and did not report to work on Saturday and did not demand heat for her apartment on a cold Sunday, December 8th. The evidence convinces me beyond a reasonable doubt that Mrs. Green was killed some time on the night of Friday, December 6th. She was probably killed by a prowler.

Just as in the *Commonwealth v. New* case (supra) we held that the defendant was not obliged in order to clear himself to prove who killed Lee Joe, so in the instant case the defendant is not obliged in order to clear himself to prove who killed Miriam Green. If later some prowler should be apprehended and confess that it was he who killed Mrs. Green when she found him in her bedroom on Friday night, December 6, 1946, it would be apparent to all how consistent with Gerald C. Wentzel's innocence of her murder were all the circumstances pre-

sented in this case. On the day this opinion is written July 2, 1948, the newspapers carry an account of a Western Union telegraph operator in Philadelphia being killed by a colored prowler.

The few conflicting statements Wentzel made after he was taken into custody are explainable on the ground that he at first wished to keep from the people of his home town the fact of his illicit relationship with Mrs. Green. When on the witness stand Wentzel was asked what his feelings were when he found Mrs. Green dead. He answered: "Have the feeling someone has taken her life and your wife is going to find it out, you know you have been doing wrong, you belong to a number of organizations, and an officer in this and that organization, and you feel as though something terrible has happened in your life."

Wigmore on Evidence, Third Edition, Volume II, page 106, in discussing the conduct of a man who is charged with crime, says: ". . . in the process of inferring the existence of that inner consciousness from the outward conduct, there is ample room for erroneous inference; and it is in this respect chiefly that caution becomes desirable and that judicial rulings upon specific kinds of conduct become necessary." He also says on page 107: "Yet experience tells us that no fixed relations of inferences can be predicated for the same conduct in different persons. The same symptom is often the result of exactly opposite psychological conditions. This sort of evidence is admitted because there is a certain degree of uniformity in its meaning, but the variations from uniformity are so frequent, and depend so much upon personal character and local circumstances that *no fixed rules should be laid down.* (Italics Wigmore's.) Repeated judicial warnings tell us that the evidence is merely to be estimated as best we can in the light of our knowledge of human nature in general and of the accused in particular."

Justice, afterwards Chief Justice, WHITE, speaking for the U. S. Supreme Court in *Bram v. U. S.*, 168 U. S.

532, 547, said (quoting from *Gilham's* case, 2 Moody, pp. 194-195): " 'The human mind under the pressure of calamity, is easily seduced; and is liable, in the alarm of danger, to acknowledge indiscriminately a falsehood or a truth, *as different agitations may prevail* . . . the law will not suffer a prisoner to be made the deluded instrument of his own conviction.' " (Italics supplied.) In *Toler v. State,* 16 Ohio St. 583, the Supreme Court of Ohio said: ". . . The defendant's case is often much weakened by an unsuccessful attempt to prove an alibi. . . . In many cases, however, a false defense of this nature is innocently interposed, under a mistake as to dates, or the order of events. In other cases the defense is true, and the evidence fails to establish it. But in no case can the attempt be held to involve an admission of crime, or the simple failure to establish it afford any presumption of defendant's presence at the time and place when and where the crime was committed."

Chief Justice COCKBURN *in Moriarty v. R. Co.,* L. R. 5 Q. B. 314, 319, said: ". . . it is evidence against a prisoner that he has said one thing at one time and another at another. . . . I do not say that it is conclusive; I fully agree that it should be put to the jury, with the intimation that it does not always follow, because a man, not sure he shall be able to succeed by righteous means, has recourse to means of a different character. . . ."

In addition to the nine facts above set forth showing that Mrs. Green must have been killed on Friday night, is the tenth fact that the scarf knitted around her neck is one that was lost on or near the sidewalk in the vicinity of Mrs. Green's apartment *on Friday night when Wentzel was in Potter County. A prowler* could have found that scarf on *Friday night* and carried it with him to Mrs. Green's apartment. It is contrary to all human probability that that scarf remained on or near the sidewalk for 48 hours and that no one picked it up until *Sunday night.* The Commonwealth's theory that Went-

zel picked that scarf up on *Sunday night* just before he went to Mrs. Green's apartment is without any support either in fact or in probabilities based on experience.

As against an array of at least ten facts clearly indicating that Mrs. Green must have been murdered on Friday night when Wentzel was far away from her, the Commonwealth offers no evidence indicative of guilt except certain statements of the defendant taken under circumstances destructive of their value as evidence. The record shows that this defendant was interrogated, sometimes at great length, more than a half dozen times in the presence of several officers and that he had no counsel or friend present on any of these occasions.

The first statement taken from Wentzel was on December 9, 1946 (Commonwealth's Exhibit C-53) at 7:50 P. M. in the presence of Assistant District Attorney, A. Benjamin Scirica, Sergeant Hahn and Sergeant Galloway of the Pottstown Police Department, and Blanche M. Famous, stenographer. *Wentzel had no counsel or friend present.* In that statement he denied that he was in Mrs. Green's apartment on Sunday night. On December 10th (Commonwealth's Exhibit C-54) he was again interrogated. He apparently had told the officer that he wished to correct the first statement made. In the second statement he said he had come to Mrs. Green's apartment Sunday night to take her some venison and that he went there from the Elks. Possibly if Wentzel had been permitted to consult counsel in the first place, counsel would have told him to tell the truth and would have assured him that the fact that he was in Mrs. Green's apartment on Sunday night would not of itself be sufficient to convict him of her murder.

Wentzel was again interrogated on December 10, 1946 (Commonwealth's Exhibit C-55) at 9:45 P. M. in the presence of the same four persons who had taken his first statement. This third statement was taken at the Pottstown police station on December 10, 1946, in the presence of the same four persons who were there. In

the third statement he denied he had a key to Mrs. Green's apartment. He said he got in when the door "seemed loose and he pushed it". He told about finding Mrs. Green's body in the bedroom. He was asked if he touched "that window or the grate". He answered: "I did not." He was asked: "If your fingerprints appear on that grate, could you explain their presence?" He answered: "If my fingerprints appear on that grate, I cannot explain their presence." This record does not disclose that there were *any* fingerprints on the grate. Certainly, there was no proof that Wentzel's fingerprints were on any grate or anywhere else in that room. Apparently, the officers were trying to get him to admit in *response to their suggestion* that his fingerprints were on the grate. He said after he saw the body he turned out the light and ran out. He testified that it took him about "5 or 6 minutes" to get to his home from Mrs. Green's. When asked why he did not call the police, he answered "fright". He said he was "that scared". Another statement was taken from Wentzel on December 10, 1946, at 10:30 P. M. (Commonwealth's Exhibit No. C-56). In that statement he admitted he had a key to Mrs. Green's apartment; that he entered her apartment by using the key. Apparently, his first denial of his possession of a key was due to his desire to show that his relationship with Mrs. Green was not so close that he had access to her apartment at all times by means of a key. The Commonwealth offered in evidence another statement of Wentzel, Exhibit C-57. It is very significant that this statement, which contains an alleged remark by Wentzel as to the handprint in the middle of her body, *was not signed by Wentzel and was not taken in question and answer form*. It was allegedly made in the presence of District Attorney Smillie, Assistant District Attorney Scirica, County Detective James Gleason and Chief James Laughead of Pottstown. The first paragraph of the statement shows that it was not composed by Wentzel since no one accused of a crime voluntarily makes

such a statement as it is claimed Wentzel made. The first paragraph reads as follows: "I, Gerald C. Wentzel, having been warned that anything I might say would be used against me and having been promised nothing nor threatened in any way, and knowing that I can be represented by counsel, say I do not want counsel. I have no fear. I have told everything I know, and I am willing to make this statement voluntarily and freely. I do not want counsel and want to say everybody has been very good and kind to me. Chief Laughead, Jim Gleason, Mr. Scirica, Mr. Smillie and Mr. Bennett have all been very nice to me, and I wish to make this statement."

In this same *unsigned* statement, Exhibit C-57, the first paragraph obviously was not dictated by Wentzel. In it there appears this statement: "She had blood on her teeth. I walked to the side of the bed and stood about the middle of her body. I said, 'Oh, my God', and that is when I put my hand on the bed and that is where the handprint will be about the middle of her body." If we knew what *suggestive* question was put to Wentzel we could fairly judge as to whether or not he made the statement attributable to him, and if he did make it, whether it was in response to some suggestive question. Anyone familiar with the administration of criminal law knows that accused persons and witnesses are often amenable to suggestions. In a book entitled "On the Witness Stand", written by Hugo Munsterberg, who was Professor of Psychology at Harvard University when the book was written, in a chapter entitled "Untrue Confessions", points out how innocent men have by suggestion been entrapped into confessing crimes they did not commit. He said: "It may be pure fatigue which may decrease our resistance against the creeping of deceptive illusions into our memory. Or it may be a simple emotional excitement; no doubt, the mere fact of being on the witness stand awakens in many minds, by its importance and solemnity, an excitement which is especially favourable for opening the memory to suggestions

and to confused ideas which group themselves around some ideas with strong feeling tone. Many a memory succumbs even to an impressive or a suggestive question."

In fairness to Wentzel and in the interest of truth the Commonwealth should have taken every possible means to ascertain whether or not the bloody imprint of a hand which it is claimed was on Mrs. Green's bed sheet *was* or *was not* the hand of Wentzel. The sheet should have been exhibited to Wentzel and his hand should have been placed upon it for the purpose of making a comparison of sizes. This sheet should have been available at the trial. If it was not available at the trial it was certainly available when Wentzel was being examined a short time after Mrs. Green's murder. The District Attorney seems to have been content to extract in some way (*how* it was extracted does not appear from Exhibit C-57 for that Exhibit contains no questions) an admission from Wentzel that he put his hand on the sheet. The District Attorney would have it *inferred* that the imprint on the sheet was Wentzel's hand. *There is no proof that it was Wentzel's hand. Wentzel never said that his hand was bloody when he placed it on the sheet.* It was entirely probable that the murderer of Mrs. Green on Friday night did put *his* bloody hand on the sheet. It is probable that Wentzel on Sunday night placed his hand on the sheet. That would have been a natural thing for him to do. It is important to note that J. E. Burke, of the Federal Bureau of Investigation, who was called by the Commonwealth as a fingerprint expert, could not identify the bloody impression on the bed sheet as having been made by Wentzel's hand. He said about it: "It appears to be the shape of one's hand, but an examination as the material is of a porous type, it will absorb any foreign substance that may be on one's hand and therefore you can't tell just exactly what it is, whether a finger print or not. I can't say definitely."

The most that the District Attorney claims in his brief of argument is that Wentzel in his Sixth State-

ment (above referred to) "admits putting his hand on the bed at about the middle thereof and actually diagrams his position by the body, where he stood and where the hand was placed". He does not claim that Wentzel admits putting a *bloody hand* on the bed. *The evidence of Wentzel's hand on the bed was of such vague and unsatisfactory character that the trial judge did not even mention anything in his charge about Wentzel's hand being on the bed.* This record clearly does not warrant the statement made in the majority opinion that Wentzel stated "that on the occasion of that very visit he had put his handprint on the bed sheet at the exact spot where the bloody impression, resembling the shape of a hand, was found". If Wentzel's hand *fitted* the bloody imprint on the sheet of Mrs. Green's bed, the District Attorney would certainly have stressed that fact *and the trial judge in his charge would have mentioned that fact.*

The statements in the majority opinion that Wentzel "had frequent quarrels with deceased; that he had a violent temper; and that he had threatened her with grievous bodily harm" are statements neither fair to the defendant nor fairly based on the whole evidence. This statement in the majority opinion is based on Commonwealth's Exhibit C-59, which is the Seventh Statement taken from Wentzel, in the District Attorney's office on January 6, 1947, in the presence of Assistant District Attorney Scirica and two police officers and when Wentzel was not represented by counsel. The Assistant District Attorney saw fit to secure evidence against this accused by resorting to most unprecedented tactics. These were by addressing questions to the defendant during the various interrogations of him when he was not represented by counsel, which questions contained matters derogatory to him. At the trial of this case he introduced in evidence the record of these eight interrogations. They occupy 90 printed pages of the record.

As to Wentzel's "frequent quarrels with the deceased", that is based on this question addressed to

Wentzel in the seventh examination, January 6, 1947, by Assistant District Attorney Scirica: "As a matter of fact, you and Miriam have been having quite a few arguments since the summertime. Will I have to point them out?" Wentzel answered: "If you call about her standing at the bar drinking when I asked her not to, maybe we had a few minor arguments, and they were all cleared up in the course of an hour or so." That is the only evidence as to "frequent quarrels with the deceased". The only evidence as to Wentzel's "violent temper" is the statement which Mr. Scirica made to the defendant at the January 6th examination: "You had a mean disposition." Wentzel said: "If there is one who says that, there are a hundred who will say the opposite. Any place I went with Mim will say we acted like a lady and gentleman. We didn't do any rough stuff." Q. "How about this fight you and Mim had in early September in Reading, and you stood her up against the wall in the Eagles Home?" A. "We didn't have a fight. She threw her earring and I found it and said, 'Wait a minute. That is a good earring', and I found the other one in the car." Q. "What did you have her up against the wall for?" A. "I didn't put her up against the wall. I was only talking to her." Q. "Did you have your hands on her?" A. "No." Q. "Did you have them around the back of her neck?" A. "No. We walked out of the place hooked around one another." Q. "What other fights did you have up there with her?" A. "We really never had fights. We had some arguments."

As to the threats of grievous bodily harm, this is based on questions and answers made in the January 6th interrogation. Q. "And you told her not to see anyone else?" A. "Sure, I told her that." Q. "What were you going to do to her if she did go out with anyone else?" A. "In a joking way I told her I would take her and tear her private parts out." While what Wentzel said to her in a joking way was highly improper, it is

unfair to construe it as a threat to do her grievous bodily harm. There are thousands of threats made in a joking way, sometimes made just to give the one making the threats a feeling of dominance. Murderers seldom threaten their victims before killing them. It is said that all Presidents of the United States received threatening letters, as do other officials, but there is no evidence that the three Presidents who were assassinated had received threatening letters from their actual assassins.

It is evident from this record that relations between Mrs. Green and Wentzel were of the most friendly character. He was in her company at least twice a week and on Sunday night, December 8, 1946, he went to her apartment with a piece of venison he had secured on his hunting trip in Potter County. He said he planned to take her to Potter County some time later. That Wentzel made threats against Mrs. Green and that relations were other than friendly is demolished by the testimony of Mrs. Katie O'Meara *who would certainly not try to shield her daughter's murderer*. Mrs. O'Meara testified that her daughter's life with *her husband* (whom she had divorced on Wednesday before she was killed) was not a happy one; that she had seen a mark on her face where Green "had smacked her". She was asked: "Do you know of your own knowledge whether Miriam was afraid of anyone?" She answered: "Well, she was shortly before she applied for her divorce." Q. "Who was she afraid of?" A. "Mr. Green." There is no member of the victim's family who testified of any ill-treatment of Miriam Green by *Wentzel*. Mrs. Green's sister testified that Mrs. Green's married life with *her husband* was not happy. If Mrs. Green had been seriously threatened by Wentzel and had been afraid of him she certainly would not have let him have a key to her apartment or if she could not get her key back from him she would have changed the lock. All indications are that relations between Wentzel and Mrs. Green were of the

most amicable character. No motive can be discovered for *Wentzel* to kill her.

The methods used in extracting statements from Wentzel in this case are methods which met the emphatic condemnation of the United States Supreme Court in *McNabb v. United States*, 318 U. S. 332. In that case after two defendants had been convicted of murder, the Supreme Court reversed the conviction and ordered their release because incriminating statements had been extracted from them by long drawn out preliminary interrogations. At the time they were questioned, there were several officers present. As the Supreme Court said: "At no time during its course was a lawyer or any relative or friend of the defendants present." The Supreme Court said further: "Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic." This Court has not taken exactly the position in such matters as has the Supreme Court of the United States, but we did say in *Commonwealth v. Turner*, 358 Pa. 350, 365: "The test to be applied to confessions secured by police officers is this long established and judicially sanctioned one, to wit: 'Was the confession secured under such circumstances and by such methods as to make it testimonially trustworthy?'" Wentzel made no confession in this case but the statement about his putting his hand on the bed and about the handprint, if made by him at all, was made by him when no counsel was present and after repeated interrogation. We have *no stenographic record* as to what was said to him in regard to the hand being on the bed or what his reply was. Wentzel said when he was on the witness stand that he was "not permitted to see a lawyer". They told Wentzel "he was cooperating beautifully and he did not

need a lawyer".[2] That was told him by District Attorney Smillie and his Assistant, Mr. Scirica. In one of the examinations of Wentzel, the officers told him that he "was on the spot". He was questioned one night until 2:00 or 2:30 in the morning. Wentzel should not be convicted on any alleged statements made by him under such circumstances and this is particularly true if such alleged statements are part of an unsigned statement attributed to him and there is no stenographer's record of the questions asked him or his answers in respect to any alleged statement of his and which the Commonwealth asked the jury to accept as true.

The fact that Wentzel admitted he knew how to tie a "square knot" and such a knot was used in tying the scarf around Mrs. Green's neck is of no probative value whatever. There are probably tens of thousands of individuals, including sailors, marines, and boy scouts and ex-boy scouts who are able to tie "square knots." There is no proof whatever that *Wentzel* tied the square knot on the scarf around Mrs. Green's neck. *Guessing* that he did so should not be permitted in a court of justice. Verdicts cannot be found on *possibilities*. They cannot be found even on *probabilities*. Chief Justice GIBSON said in *Carmalt v. Post,* 8 Watts 406, 411: "a jury are not to determine by the light of probabilities."

Even if I was not convinced that the verdict against Wentzel should be set aside because the evidence was legally insufficient to warrant his conviction, I would still hold that he is entitled to a new trial because of the many trial errors. One of the most serious is the introduction of evidence, Exhibit C-59. This is the statement

---

[2] Wentzel testified "I was not permitted to see a lawyer" and he also testified he was kept in the District Attorney's office from ten o'clock in the morning on January 6th until two o'clock the next morning. He was asked: "In that time were you questioned constantly?" He answered: "Yes, by no less than three or four people at all times. State Police, Assistant District Attorneys, Detectives and Officers of the Pottstown police force."

made by defendant on January 6, 1947, in reply to questions addressed to him. He was asked whether or not Mrs. Green was pregnant on May 12th, last year (1946). He answered: "I think she was." Q. "And there was an abortion performed?" A. "You mean she went to a doctor and had an illegal operation? No, indeed. I know that." Q. "Then she took medicine?" A. "The way this woman told her to take some tea or something." This was clearly charging Wentzel with another crime *in no way related to the crime* for which he was being tried, therefore, wholly inadmissible. It had *no probative* value, only *prejudicial* value. This Court as recently as January 1947 in a unanimous opinion in *Commonwealth v. Jones*, 355 Pa. 594, 50 A. 2d 342, reversed a verdict of guilty of murder in the first degree with the death penalty because the Commonwealth put in evidence the testimony of two detectives who testified to oral statements made to them by the accused while in their custody. These statements were that the defendant had been previously arrested for other crimes. In that case Mr. Justice DREW said in his opinion: "It is fundamental that no testimony is admissible unless it is relevant, i. e. unless it is of a nature to afford evidence tending to prove or to disprove the matters in issue." Even if Wentzel had been guilty of procuring an abortion on Mrs. Green, that would in no way tend to prove or disprove the charge that he murdered her. There are other prejudicial statements put in by the same methods, that is, by asking him about his temper, about his striking people. For example, in Exhibit C-59 Assistant District Attorney Scirica said to Wentzel: "We have statements from people who give us your work history and tell us about your temperament on a basketball court and tell about your habit of slapping or hitting a girl across the neck. You don't deny that?" A. "No." Q. "You were called down for it many times?" A. "That was a long while ago. I bet it is two years since I did that." Q. "They tell us that you have a mean disposition when you are

drinking. You are not the calm, mild-mannered young man that you are when you are sober. There are times when you are very boisterous and playboyish and other times you have a pretty mean disposition." Wentzel replied: "If there is one who says that, there are a hundred who will say the opposite." The statement against Wentzel which Assistant District Attorney Scirica thus put in the record against the defendant was highly improper and it doubtless prejudiced this defendant before the jury.[3] I have never seen another case where such methods in prosecuting a criminal had been used by the district attorney or his assistant. Every District Attorney should remember the admonition of Chief Justice PAXSON in *Commonwealth v. Nicely*, 130 Pa. 261, 270, to wit: "The district attorney is a quasi judicial officer. He represents the commonwealth and the commonwealth demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers, as it is to see that no guilty man escapes. Hence, he should act impartially. He should present the commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate. When he exceeds this limit, and in hot zeal seeks to influence them by appealing to their prejudices, he is no longer an impartial officer, but becomes a heated partisan."

The statement which the District Attorney made and which was offered in evidence as Exhibit C-59 and was sent out to the jury is another example of how the District Attorney exceeded legitimate limits in seeking the conviction of this defendant. This Exhibit shows that

---

[3] The District Attorney in his preliminary investigations interrogated Wentzel's wife as to whether or not Wentzel had ever struck her. She answered, "No". He asked, "Did he ever shove you?" She answered, "No". He asked, "Are you sure he never hit you?" She answered, "No". He said, "Tell me the truth. Did he or did he not ever strike you?" She answered, "No". There is no evidence in this case that Wentzel ever physically abused either his wife or Mrs. Green.

Assistant District Attorney Scirica said to Wentzel when the latter was being interrogated by the Assistant District Attorney in the presence of officers and without Wentzel having his own counsel or any friends present, to wit: "One thing I cannot understand about your story is this: You are finally placed in that apartment. You won't even admit that at first, but eventually you do admit you are in the apartment. You tell us how you got in and then you change your story, and then you swear by all that is Almighty you went into the living room. . . . You admit being in the bedroom and there is no doubt in our minds that you were in the bedroom. And when you got in that bedroom, I don't believe that there was not something between you and her that you haven't told us about. I don't believe that because I don't believe a man like you would see a dead body and walk out immediately, and that is why I don't believe that you walked in that bedroom when that body was dead. I think she was alive. I know she was alive, and now is the time to tell me what happened in that bedroom, and you have an answer. She may have threatened you. She may have said something to you. She may have been mad at you. She may have been drunk. You know the answer, and I say to you, Gerry, give the true answer. If she did threaten you, if she had been drinking, tell us." To this long and unfair harangue on the part of the Assistant District Attorney, Wentzel made the following apparently honest answer: "She was going to her sister's and didn't go. She was going to call me from Reading Sunday night, and she didn't." Mr. Scirica said: "When did you expect that telephone call from Reading?" Wentzel answered: "If she was coming on the 9:30 train she was going to call the Elks, but she didn't call."

If Assistant District Attorney Scirica *had taken the witness stand and testified as he indirectly testified* when he put the foregoing statement to Wentzel his direct testimony from the witness stand could not have been more

grossly improper and prejudicial than it was for him to introduce that statement into the case the way he did. The court should not have permitted it. Its introduction was a flagrant error.

I do not believe another case can be found in the long history of criminal jurisprudence in Pennsylvania where any such statement made by a district attorney or any other official to the accused was received when that accused was on trial for murder. In other words, in this case the Assistant District Attorney made statements to the accused asserting that Mrs. Green was alive when Wentzel visited her apartment at 11:00 P. M., December 8th. The District Attorney had *absolutely no evidence whatever of that fact* and he should not have put any such statement before the jury. *His* statement was not evidence and was grossly prejudicial to the defendant, as was his statement about the alleged abortions.

I also agree with appellant's counsel that the introduction in evidence in this case of eleven exhibits showing the battered nude body of Mrs. Miriam Green was prejudicial to the defendant. The evidence was totally unnecessary and constituted an abuse of discretion. There were ten women on this jury and the viewing of these photographs by the jurors in the jury room did not tend to create and maintain in the minds of the jurors that atmosphere of cold and clear reasoning in which any defendant accused of crime is entitled to have his guilt or innocence determined.

Excepting the fact that Wentzel lied when he said he did not visit Mrs. Green's apartment on Sunday night and when he said he did not have a key to her apartment (which lies he frankly corrected a little later) Wentzel's conduct after his being taken into custody was that of a man who was *conscious not of guilt, but of innocence.* If Wentzel had murdered Mrs. Green, the *first* demand he would have made when he was taken into custody would have been for a *lawyer.* The fact that he did not

demand a lawyer shows that he believed that his innocence would soon be demonstrated and the police would apprehend the man who did murder Mrs. Green. A guilty man accused of crime feels at once in need of professional assistance. Wentzel did not. However, that fact did not justify the district attorney's subjecting Wentzel to repeated interrogations which, with Wentzel's answers, covers ninety printed pages of the record and extends in time over a period of a month, without advising Wentzel that he ought to have counsel present to safeguard his interests.

In its opinion refusing a new trial in this case, the court below listed 14 so-called "points of the Commonwealth's evidence upon which a conviction was sought." Everyone of these points is entirely consistent with Wentzel's innocence and therefore possesses no probative value as evidence of his guilt,[4] as we herein show.

The first point listed by the court is that "Wentzel, a married man, had, for at least a year, been carrying on an illicit and meretricious relationship with Mrs. Green." The existence of an illicit relationship between two persons does not prove the allegation that one of these persons murdered the other.

Second, the court cites the fact that "The scarf used to strangle Mrs. Green was tied with a 'square' knot as distinguished from a so-called 'granny.'" There is nothing difficult about tying a square knot. Presumably, millions of people can tie such a knot. One can learn to tie such a knot by consulting an ordinary dictionary. In tying a knot even casually one is as likely to tie a "square knot" as he is to tie a "granny knot".

Third, "There were no signs of a struggle." If a prowler entered Mrs. Green's bedroom, he could easily

---

[4] In the *Knee New Case*, 354 Pa. 188, the court below listed 52 points upon which a conviction was sought. This court declared that everyone of the 52 points was consistent with defendant's innocence and ordered his release from a life sentence for murder.

have strangled her before she had a chance to struggle. The absence of "signs of struggle" proves nothing against Wentzel.

Fourth, "There was evidence of a quarrel between Wentzel and Mrs. Green the week before her death." This quarrel, as we have pointed out, was a mere inconsequential "spat."

The fifth point refers to the threat that Wentzel made against Mrs. Green, which is already referred to. That was merely a ribald threat such as is commonly made by some people who like to indulge in strong or coarse language.

Sixth, "The Commonwealth alleged that Wentzel had a violent temper." This is merely an allegation. There is no proof that his temper was different from that of the average individual.

Seventh, "The defendant admittedly had a key to the Green apartment and admittedly threw such key into the Schuylkill River shortly after Mrs. Green's body was discovered. The Commonwealth might argue that the removal of the grating and the opening of the bedroom window was only to divert suspicion from a man who had the key to the apartment." There is not a shred of evidence that *Wentzel* removed the grating and opened the bedroom window. A prowler could have done that.

Point eight refers to the testimony of Doctors Franck and Simpson as to the time of Mrs. Green's death. We already discussed that and we have shown that Dr. Franck's testimony was contradictory and worthless and Dr. Simpson stated Mrs. Green at 7 P. M., December 9th, "could have been dead 24, 48, or 72 hours." In order to convict Wentzel, it was necessary for the Commonwealth to prove that Mrs. Green met her death while Wentzel was in her apartment. This testimony presented by the two doctors is too vague to be made a basis of finding that Mrs. Green was killed at 11 P. M. Sunday night.

Ninth, "The defendant's admitted presence in the Green apartment at 11 P. M. on December 8th." This proves nothing. All the evidence indicates Mrs. Green had been dead 48 hours by 11 P. M., December 8th.

The tenth point refers to the contradictory statements made by the defendant shortly after being taken into custody. We have shown how a person having such a relationship as Wentzel had with Mrs. Green might in the first few hours of panic deny that relationship. The court also says under point 10 that Wentzel admitted that the bloody imprint on the bed clothing resembling the shape of a hand "might have been made" by his hand. *He made no such admission.* Even if he had made the statement that it *might* have been his hand, such a statement would have been too vague to base a finding upon it. Even the F. B. I. expert *refused to testify* that the bloody imprint was that of a hand or that it was made by Wentzel's hand.

Eleventh: This point cited by the Commonwealth refers to the fact that "the scraping from the fingernails of Wentzel showed the presence of human blood." Wentzel (as we have pointed out) had a skin disease which resulted in bloody cracks or eruptions on his hands and on other parts of his body. He could easily get blood under his nails by scratching the eruptions just as persons can get blood under their nails by scratching an erupted scalp.

In the twelfth point the court states that Wentzel said "when he left the apartment shortly after 11:00 o'clock all the lights were out in the apartment and he was home in bed at 11:10 P. M." The court says: "The Commonwealth produced the positive testimony of one witness that a light was on in the Green apartment at 11:30 P. M. on December 8th. The witness based his testimony upon the time shown by his clock when he entered his apartment." When the witness entered his apartment, *his clock* may have been 10 minutes fast. We have no evidence as to the kind of clock it was or whether

its time was accurate. Most house clocks, except electric ones, are unreliable timekeepers. Wentzel's own clock might have been innacurate.

Thirteen: The court says that "Wentzel stated that Mrs. Green had shown him her divorce decree on Wednesday night, December 4th. The Commonwealth showed that this decree could not have been in the possession of Mrs. Green at that time." It was testified to in the case that Mrs. Green's attorney wrote her a letter on December *3rd* in which he had stated that the divorce had been granted and he "will send the decree." When Wentzel and Mrs. Green met on December 4th, she showed him this letter. Wentzel apparently got the impression that this letter was the divorce decree. In any event, he learned from Mrs. Green before he went on his hunting trip that she had received her divorce. Whether the actual divorce decree was in Mrs. Green's possession and she and Wentzel discussed it, is utterly immaterial.

In the fourteenth point the court refers to the fact that "the scarf . . . [which was around Mrs. Green's neck had been lost] at a point near where Wentzel was in the habit of parking his car when he called upon Mrs. Green." In order for Wentzel to have used this scarf to strangle Mrs. Green, he would have had to pick it up *Sunday* night. It had been lost by its owner on *Friday* night. It is highly improbable that the scarf would have laid in the street 48 hours without somebody's picking it up. The court said Mrs. Green might have picked it up. That is mere guessing. There is no proof that she was out of her apartment after 6:00 P. M. Friday; the scarf was lost at 1:00 P. M.

Everyone of these "points" listed by the court is entirely consistent with Wentzel's innocence. No man can be justly convicted on circumstantial evidence unless the evidences *excludes* every reasonable hypothesis except that of his guilt. For example, if A and B were in a room together and a pistol shot was heard and B was found dead with a pistol wound in his head, that fact would

not exclude the hypothesis that B may have shot himself. A could not be convicted of murder on the facts just cited. However, if B is found in a room where there is an axe and with B's head chopped off, the only reasonable hypothesis would be that *A* chopped B's head off. In the one case, the evidence is consistent with A's innocence. In the other, it is consistent only with his guilt. In *Com. v. Giovanetti,* 341 Pa. 345, 353, 19 A. 2d 119, this Court quoted with approval the following: " 'The mere presence at a homicide and knowledge of its commission, does not make a person guilty unless he aids, assists and abets': Warren on Homicide, Vol. 1, p. 228, sec. 62 (citing cases). If one is 'only a terrified onlooker,' neither his presence at the homicide nor his failure to report it would make him an accomplice: Bird v. U. S., 187 U. S. 118, cited with approval in Com. v. Loomis, 267 Pa. 438, 444, 110 A. 257."

The weakness of the Commonwealth's case and the injustice of the verdict of guilty on the evidence presented against Wentzel, is illustrated by a statement made by the court below in refusing a new trial. The court after saying that "Dr. Franck's testimony may not be entitled to as much weight as that of Dr. Simpson," then refers to the fact that Dr. Franck in his testimony placed the time of Mrs. Green's death "rather close to 11 P. M. on December 8th", but that he told Coroner Rushong that "Mrs. Green had not been dead over three hours." The court said this statement "could not be correct." It then adds: "Dr. Simpson's testimony also fixed the time of death *as within a period covering 11 P. M.* on December 8th." (Italics supplied) It is *not* enough to fix the time of Mrs. Green's death *"within a period covering 11 P. M. on December 8th."* In order to convict this defendant the Commonwealth was obliged to *fix the time* of Mrs. Green's death as *Sunday night, December 8th.* The Commonwealth's best medical witness, Dr. Simpson, said that on Monday, December 9th, Mrs. Green "could have been dead 24, 48 or 72 hours." Undertaker

Kent said on Monday, December 9th, Mrs. Green had been dead 48 to 72 hours. The Commonwealth *utterly failed to offer definite evidence that Mrs. Green was killed on Sunday, December 8th.* Wentzel had no opportunity to kill Mrs. Green on either December 6th or December 7th. He was then over 150 miles away.

The majority opinion says "The jury could reasonably infer from the fact . . . [that after Wentzel committed] the killing, he sought to avoid suspicion by removing the screen and grating and opening the door and bedroom window." The answer to that is that there is *not a shred of evidence* that *Wentzel* "removed the screen and grating" and opened "the door and bedroom window." To say that he did is guess work. It is just as reasonable to guess that *a prowler or some other person* removed the screen and grating and opened the door and bedroom window either before or after killing her.

The majority opinion says: "We also have defendant's admissions that he fled from the apartment, knowing that she was dead, and that he thereafter deliberately, to divert suspicion, threw away the key with which he had gained entrance to the apartment . . ." This statement is completely unfair to the defendant. The implication is that he threw away the key "to divert suspicion that he murdered Mrs. Green." The obvious cause of his throwing away the key was his momentary fear that his possession of a key to her apartment would indicate a close intimacy with her, and at that time he was trying to minimize that intimacy. Within 45 minutes he corrected his statement about the key and admitted the fact of its possession. He was not obliged to admit this fact. If he had killed Mrs. Green he probably would not have admitted that he was in her apartment at all on Sunday night.

The following statement in the majority opinion is also unfair to Wentzel: "We also have defendant's own admissions that he was at the scene of the crime at or

about the very time when two reputable physicians, called by the Commonwealth, stated that deceased had met her death; and that on the occasion of that very visit he had put his handprint on the bed sheet at the exact spot where the bloody impression, resembling the shape of a hand, was found." The first part of this statement is based on the assumption that "two reputable physicians" set the *exact time* when Mrs. Green met her death. They did nothing of the kind. One of these two physicians is Dr. W. L. Franck. He went to Mrs. Green's apartment about 3:00 P. M., December 9th. He examined the body only to determine whether or not she was alive or dead. He gave as his professional opinion that the body was not dead more than 12 hours. That would make the hour of death about 3:00 A. M. Monday or 4 hours *after* Wentzel was in her apartment. But this same Dr. Franck reported to Coroner Rushong at 3:00 P. M. on Monday December 9th that he thought the woman was dead about "3 or 4 hours." That would make the time of death about 11:00 A. M. or 12:00 P. M. December *9th*. The other physician testified that on Monday evening December 9th, the body of Mrs. Green "could have been a corpse for 24, 48 or 72 hours."

As to the bloody imprint of the hand, it is very significant to note that the district attorney never asked the defendant to place his hand on the bloody impression in order to make a comparison between the defendant's hand and the impression on the bed sheet. The trial judge in his charge said nothing about the bloody hand on the sheet and in the court's opinion refusing a new trial, all it said about the imprint of the hand was that Wentzel admitted that the bloody imprint resembled the shape of his hand and "might have been made" by his hand. Even this statement is not warranted by anything Wentzel had said. When Wentzel was on the witness stand at the trial of this case, he said that when he was examined by the district attorney, the latter said: "now, make sure what you are saying did you or did you not

touch that bed." Wentzel testified: "I said, 'I did not touch the bed', and he said, 'there is a hand print of blood on there, tell us, did you touch the bed'. And I said that I did not. Then I got thinking. I said, I may have inadverently in the shock went down and touched the side of the bed. There is a drawing which the jury has seen. I made a drawing of where I stood along side of the bed." It is very significant that when Assistant District Attorney Scirica cross-examined Wentzel at the trial he asked him *no question whatever about the imprint of the bloody hand on the bedspread* (or sheet, as it is sometimes referred to in the record). The manifestly correct and fair thing for the Assistant District Attorney to have done when Wentzel was on the witness stand was to ask him if the bloody imprint on the bedspread had been made by him and if Wentzel answered "No", he should then have been asked to place his hand upon the imprint so that the jury might have made a comparison between the size of the imprint and the size of the hand.

The reading of this record shows that the District Attorney was anxious to *make it appear* that the imprint on the bedspread was made by Wentzel's hand, without offering the slightest legal proof of that allegation. Certainly a quasi-judicial officer, as the District Attorney is, whose plain duty it is to help to ascertain the *truth or falsity* of a grave criminal charge made against an accused, should not have been satisfied to let the jury merely *guess* that the imprint was made by a hand and that the hand was Wentzel's.

The unsigned alleged statement by Wentzel, not in interrogative form, and obviously not dictated or drafted by him, reveals what the District Attorney resorted to in order to *make it appear* that Wentzel had placed a bloody hand on the bedspread. The issue of a man's life or liberty should never be decided in a court of justice on mere guesses or appearances. Appearances are often deceiving and guesses are never reliable. The *F. B. I.*

expert, J. E. Burke, called by the Commonwealth to testify said nothing which would support the theory as to the imprint on the bedspread. He said: "you can't tell just exactly what it is, whether a finger print or not."

The majority opinion admits that Mrs. Green's "working clothes were neatly folded over a chair in the bedroom." As these were *the only* clothes folded over a chair in the bedroom and as she did not work after Friday, December 6th, the inference is clear that the last time Mrs. Green disrobed and went to bed was on Friday night. That was the night on which apparently she was murdered. No one saw her alive after that night.

The majority opinion says that Wentzel "had caused her [Mrs. Green] to be pregnant in the Spring of 1946 and an abortion had been committed." The evidence introduced in this case about an abortion was utterly irrelevant as it had nothing to do with the murder and it was highly prejudicial to the defendant and should have been excluded. The statement in the majority opinion that Mrs. Green did not have a telephone in her apartment and therefore "might have found it inconvenient to call her mother" is no answer to the mother's testimony that on any Saturday night when Mrs. Green did not come home she always telephoned her and that the daughter had promised to come home and spend the weekend with her on Saturday, December 7th. It was proved in this case that Mrs. Green could always use the telephone of her neighbors on the floor above her and often did so.

It is *impossible* in reading this record to find *proof beyond a reasonable doubt* that Mrs. Green was murdered on Sunday night, December 8, 1946. No one can read the testimony of the doctors and the morticians as to how long Mrs. Green had been dead when her body was discovered on December 9th without either being convinced that Mrs. Green was killed on Friday, December 6th, or being in doubt as to just when she was killed. This doubt belongs to the defendant for he can be legally convicted only by proof beyond a reasonable doubt that,

first, Mrs. Green was killed on Sunday night; December 8th, and, second, that he was the man who killed her. This and other courts have repeatedly held that to show that a defendant had an *opportunity* to kill another who was killed *does not constitute proof of guilt*. This was discussed in *Commonwealth v. New*, 354 Pa. at pages 199 and 200. This record shows that Wentzel did not have even an *opportunity* to kill Mrs. Green when she was killed, to wit, on Friday, December 6, 1946, for he was then in Potter County.

As this Court said in a unanimous opinion in *Commonwealth v. New*, supra, on page 221: "It was not necessary for this defendant, in order to be acquitted, to identify the unknown who may have committed this murder. It was the duty of the Commonwealth in order to obtain the accused's conviction to show circumstances that are consistent only with the hypothesis of his guilt. Since the Commonwealth failed to do that, it was the trial judge's duty to direct the jury to find him not guilty." In *Commonwealth v. Harman*, 4 Pa. 269, 272, Chief Justice GIBSON instructed the jury that they should not convict unless they were convinced of the defendant's guilt "beyond a reasonable doubt" and could not reconcile the evidence "to any reasonable hypothesis of innocence." The evidence in *this* case *is* reconcilable with the hypothesis of Wentzel's innocence and it is also reconcilable with the hypothesis that a prowler entered Mrs. Green's first floor apartment on Friday, December 6th (as a prowler had done a few weeks earlier) and that this time the prowler killed her upon his being discovered, or that someone who had reasons to hate Mrs. Green enough to kill her did so when her friend Wentzel was on his hunting trip 150 miles away.

Even if Mrs. Green had been killed on Sunday night, that fact would not be sufficient to convict Wentzel of her murder. Some one might have entered her apartment one hour or other short period of time before Wentzel entered the apartment and killed her. In the

*Jonathan Bradford* case in England, cited in this opinion and also in *Commonwealth v. New,* 354 Pa. 188, 200, footnote 3, the actual murderer had killed his victim only a *few seconds* before the innkeeper Bradford entered the room. Bradford was executed for the murder. Later the real murderer confessed that he had fled from the room "scarcely two seconds" before Bradford entered. The cases mentioned in footnote 6, page 219, in *Com. v. New,* supra, show that the courts have uniformly held that "Evidence which does not go beyond showing that the defendant had an opportunity to commit the crime is insufficient." In the instant case, the evidence shows that Wentzel did not even have an opportunity to commit the crime as Mrs. Green was killed Friday night when Wentzel was hunting in Potter County.

The Commonwealth utterly failed to produce evidence which is consistent only with the hypothesis of Wentzel's guilt of the murder of Mrs. Green. Every fact proved by the Commonwealth in this case can be accepted as true *without any one* of such facts or *without all* of those facts *taken together* proving to a moral certainty or beyond a reasonable doubt that this defendant, Gerald C. Wentzel, murdered Mrs. Miriam Green. The jury should not have been permitted to guess [5] his guilt

---

[5] In criminal cases a higher degree of proof is required than in civil cases and yet even in civil cases it has been held, as this Court said in an opinion by Mr. Justice HORACE STERN, in *Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc.,* 345 Pa. 398, at 400: "All orders and decrees of legal tribunals, including those of administrative boards and commissions, must be supported by evidence sufficient to convince a reasonable mind to a fair degree of certainty; otherwise our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators. 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion': (Citing United States Supreme Court and other cases.) 'The rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power' (citing cases). 'Suspicion may have its place, but certainly it cannot be substituted for evidence'."

from these facts, all of which is based on nothing but conjecture or suspicion and this verdict so based *should not be permitted to stand.* It should be set aside as was the verdict in the case of *Commonwealth v. New,* supra. That verdict of murder in the first degree with the penalty of life imprisonment was based on suspicion as was the verdict of murder in the second degree in this case of *Commonwealth v. Wentzel.* The verdict in the *Knee New* case was set aside by this Court on May 28, 1946. In my judgment the verdict against the defendant should be set aside and the defendant released from custody, exactly as was done in the *Knee New* case.

Mr. Justice ALLEN M. STEARNE and Mr. Justice JONES join in this dissent.